(No. 28276.—

THE PEOPLE *ex rel.* Willard G. Goodman, County Collector, Appellant, *vs.* THE UNIVERSITY OF ILLINOIS FOUNDATION *et al.*, Appellees.

*Opinion filed November 22, 1944.*

JOHN J. BRESEE, State's Attorney, of Urbana, for appellant.

SVEINBJORN JOHNSON, of Urbana, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendants, the University of Illinois Foundation (hereinafter referred to as the Foundation) and the Board of Trustees of the University of Illinois (hereafter designated as the Board) filed objections in the county court of Champaign county to an application of the county collector for a judgment against, and an order for the sale of, four parcels of improved real estate known as the Illini Union Building, Men's Residence Halls, Illini Hall and the Arcade for the nonpayment of taxes for the year 1942. From a judgment sustaining the objections, the collector appeals.

The objections charged, first, that the properties were, during the year 1942, and now are, used for public edu-

cational and university purposes and, further, that they were obtained and leased by the Board exclusively for these purposes. Additional grounds of objection are (1) that during the years 1941 and 1942 the property was owned by the State of Illinois and (2) that they are owned by a charitable organization, the Foundation, and actually and exclusively used for its charitable purposes. The Foundation is a corporation organized as a corporation not for pecuniary profit. (Ill. Rev. Stat. 1941, chap. 32, par. 158 *et seq.*) The corporate object, in part, is: "a. To assist in developing and increasing the facilities of the University of Illinois for broader educational opportunities for and service to its students and alumni and to the citizens of the State of Illinois, by encouraging gifts * * * and by such other proper means as may seem advisable. b. To receive, hold and administer such gifts with the primary object of serving purposes other than those for which the State of Illinois ordinarily makes sufficient appropriations; to act without profit as trustee of educational, or charitable trusts; to administer gifts, grants or loans of money or property, real or personal, whether made by or for the benefit of public governmental bodies, State or National, or by or for the benefit of corporations or natural persons, and whether in the form of conventional express trusts or otherwise." The bylaws of the Foundation proclaim it to be "a wholly non-profit corporation," and its purposes "wholly charitable and educational." Language identical to that used in the charter describes the nature and purpose of the Foundation. In addition, its expressed object is "to assist in developing and increasing the facilities of the University of Illinois for broader educational opportunities for and service to its students and alumni and to the citizens of the State of Illinois, by encouraging gifts of money, property, works of art, historical papers and documents, museum specimens and other material having educational, artistic or historical value, and by such other proper means

as may seem advisable." The bylaws also grant power to the foundation to "act without profit as trustee of educational or charitable trusts."

The Foundation holds the naked legal title to each of the four properties involved in this litigation. Conformably to authority granted by the General Assembly in 1935, an extensive building program was carried out by the University. The legislation was designed to permit the University to avail itself of funds under the public works program of the United States for the construction of so-called self-liquidating projects which could produce income sufficient to discharge a long-term indebtedness amortized over a period of years. For the reason that the University was prohibited by statute from incurring any indebtedness chargeable against the State in the execution of this program, it became necessary to place title to the respective properties in a legal entity having the power to contract and incur debts in its own name and to enter into obligations maturing over an extended period of time. The Foundation was peculiarly adapted to serve this purpose. Without narrating the details of the transaction, it suffices to say that the site for the Union Building was conveyed by the Board to the Foundation, the latter agreeing "to hold said property in trust." The building was erected from the proceeds of a grant by the United States of $524,820 and of a loan of $656,000 obtained by the Foundation from an insurance company. An agreement between the Foundation and the Board provided that the former would maintain the property and lease it to the Board at an annual rental of approximately $95,000, and, upon the discharge of its indebtedness, convey legal title to the Board. The Union Building is a large structure and offers a variety of services to the student body of the University. The ground or basement floor is occupied by a bowling alley, a cafeteria, a grill room, cafeteria service

area and various service rooms. Several lounges, a library, a game room and a dining room, together with service rooms and offices, occupy the first floor. Located on the second floor are a general lounge, a faculty lounge and a ballroom. On the third floor are various meeting and dining rooms. Fourteen guest rooms, with space for approximately nine more such rooms, together with storage equipment and other service rooms, are on the fourth floor. A board of fourteen persons known as Illini Union Board supervises the management of the building. Personnel of this board includes faculty members, alumni of the University and students. Concerts, art exhibits and lectures are provided in the building for the students of the University. Classes in dancing and bowling are also available. Meals are served daily in the dining rooms in the basement and on the first floor. Members of the general public have, on occasion, made use of these facilities. Use by the public is, however, neither invited nor encouraged, and efforts have been made to restrict use of the food service to students and staff members. In any event, a liberal estimate of the public use is somewhat less than three per cent. The dining rooms on the third floor were designed for group use and have been utilized at times by public groups as well as student organizations. The ballroom has been used for student dances and, also, for civic activities, including meetings of the Community Chest of the county, the All-State football banquet and annual social meetings of the Illinois State Bar Association. The bowling alleys, although used primarily by students and classes of the University, have occasionally been used by members of the public. For services to the public, a fee has been charged for meals and special services, but no specific rental has been charged for the use of a room for meetings or conventions, the purpose being merely to obtain reimbursement for direct expense incurred.

The Men's Residence Halls were financed in a manner similar to the method used for the Union Building, but without a grant from the United States. Title to the property is in the Foundation and a mortgage indebtedness was incurred by the Foundation to provide a portion of the funds necessary for the erection of the building. The Board enjoys exclusive use and control of the building and pays a sum sufficient to service the loan and discharge it in approximately twenty years from the date of the mortgage notes. The property consists of three buildings. Each of these residence halls has student rooms, dining rooms and other service rooms sufficient to accommodate approximately three hundred students. Room service is open to these men by individual agreements between the student and the Board, and it charges a fee, or rental, for this service.

The properties known as Illini Hall (or Student Center) and the Arcade originally belonged to the University of Illinois Union, a corporation not for profit. November 28, 1941, these properties were conveyed to the Foundation, subject to a mortgage indebtedness, subsequently refinanced. Thereafter, the properties were leased by the Foundation to the Board. The offices and plant of the Illini Publishing company, publisher of *The Daily Illini*, a morning newspaper with a reportorial and editorial staff composed entirely of students, occupies the first or basement floor of Illini Hall. This paper enjoys a general circulation among the university students and such residents of the county, and elsewhere, as may desire to subscribe. Space is made available to the company by agreements with the Board in return for a fee, or rental. On the second or main floor are offices occupied by various departments of the University, including the Director of Residence Halls, Student House Division, the business office of the Athletic Association, the Extension Service, Engineering Ex-

tension Service, the Special Aids Service and the summer session. Also located on this floor are lunchrooms for the use of students who reside on the third and fourth floors of the Student Center. The student rooms are occupied by men students of the University under individual agreements with the Board for which service a fee is charged. .

On the first or ground floor of the Arcade building is presently located a restaurant and confectionary operated by a private individual who pays rent to the Board pursuant to a lease. A barbershop is also located on this floor. It is likewise operated by a private individual under a leasing agreement with the Board. A co-operative bookstore organized as a department of the University, a bowling alley and a pool and billiard room operated by the Board are also on this floor. The bowling alley is used by students and by classes of the University and, occasionally, by individual members of the general public. The second floor is occupied by departments of the University including, among others, the Visual Aids Service and the Science Aids Service.

The income and receipts from the operation of the four properties are held by the Board under its agreements with the Foundation, to be paid conformably to such agreements. No part of these receipts, income or fees, it is agreed, inures to the benefit of any member or officer of the Foundation in the form of dividends or other return on any capital invested or contributed. Indeed, the evidence discloses a deficit in operations for the same tax year or period as the assessments and taxes assailed. A deficit of $56,261.07 was incurred in the operations of the Union Building, $4607.14 by the Men's Residence Halls, $7606.52 by Illini Hall and $4490.01 by the Arcade.

Section 3 of article IX of our constitution provides that "The property of the State, counties, and other mu-

nicipal corporations, both real and personal, and such other property as may be used exclusively for agricultural and horticultural societies, for school, religious, cemetery and charitable purposes, may be exempted from taxation; but such exemption shall be only by general law." Pursuant to the authority granted, the General Assembly has exempted from taxation "* * * all property of schools, including the real estate on which the schools are located and any other real estate used by such schools exclusively for school purposes, not leased by such schools or otherwise used with a view to profit; and all lands, moneys, or other property heretofore or hereafter donated, granted, received or used for public school, college, seminary, university or other public educational purposes, and the proceeds thereof, whether held in trust or absolutely." (Ill. Rev. Stat. 1943, chap. 120, par. 500.) Defendants maintain that the four properties are exempt from taxation for the reason that they are used for public educational purposes and that, this being so, the exemption applies irrespective of whether the Foundation, a corporation, owns them since they are "not leased or otherwise used with a view to profit." The statute must be strictly construed and debatable questions resolved in favor of taxation. (*People ex rel. Lloyd* v. *University of Illinois,* 357 Ill. 369.) Nevertheless, in ascertaining whether the use of property for an exempt purpose is exclusive, the statute is "not to receive an unreasonably narrow construction." (*People ex rel. Pearsall* v. *Catholic Bishop of Chicago,* 311 Ill. 11.) The determination of the question whether a designated parcel of property is exempt from taxation requires a consideration of the particular factual situation presented. The primary use to which the property is devoted, and not its secondary or incidental use, is controlling. (*People ex rel. Pearsall* v. *Catholic Bishop of Chicago,* 311 Ill. 11; *First Congregational Church* v. *Board of Review,* 254 Ill. 220.) If the

property is devoted to a purpose exempt within the contemplation of the law, an incidental use of its facilities for another purpose, when not for profit, does not defeat the exemption. (*Grand Lodge of Masons* v. *Board of Review,* 281 Ill. 480; *People ex rel. Thompson* v. *First Congregational Church,* 232 Ill. 158.) Again, where the principal and primary purpose to which property is employed is for a public educational, charitable, municipal or other exempt purpose, the mere fact that income is incidentally and secondarily derived from its use for a nonexempt purpose does not necessarily render the property taxable. (*City of Mattoon* v. *Graham,* 386 Ill. 180; *People ex rel. Greer* v. *Walters Chapter, D.A.R.* 311 Ill. 304.) In determining whether the use to which certain property is put is for an exempt purpose, the intention of the owners of such property when putting it to use must first be ascertained. (*State ex rel. Eveland* v. *Erickson,* 44 S. D. 63.) Residence halls or dormitories, dining rooms, clubhouses and recreational facilities necessary and proper in conducting an educational institution of the character of the University of Illinois, are not, as the collector insists, for gain or profit. They are, consequently, exempt from taxation, notwithstanding they may produce some income, since not leased or used with a view to profit within the terms of the applicable statute. (*Western Theological Seminary* v. *City of Evanston,* 325 Ill. 511; *City of Chicago* v. *University of Chicago,* 228 Ill. 605; *Monticello Female Seminary* v. *People,* 106 Ill. 398; *Elder* v. *Trustees of Atlanta University,* 194 Ga. 716.) Grounds and buildings used for baseball, football, or bowling are exempt as a reasonably necessary adjunct of educational and recreational processes. (*Emerson* v. *Trustees of Milton Academy,* 185 Mass. 414; *Webb Academy* v. *City of Grand Rapids,* 209 Mich. 523; *People ex rel. Missionary Sisters* v. *Reilly,* 85 App. Div. 71, affirmed 178 N. Y. 609.) Property used as a play-

ground for students has been exempted. (*People ex rel. Thompson* v. *St. Francis Academy,* 233 Ill. 26.) Similarly, exemption has been accorded grounds containing a lake used for swimming. *People ex rel. Pearsall* v. *Catholic Bishop,* 311 Ill. 11.

The Foundation is a corporation and, as a general rule, the character of a corporation and the object for which it was organized must be ascertained from its charter or certificate of incorporation. (*Turnverein "Lincoln"* v. *Board of Appeals,* 358 Ill. 135.) The type or character of the Foundation is indicated by its charter and its bylaws. It was organized as a nonprofit corporation and, in a very real sense, the four properties in controversy, to which it holds the legal title, are used for educational purposes. Included in the properties are the Men's Residence Halls, occupied by students of the University. The Union Building serves many purposes. The ever-expanding scope of modern education calls for more than classrooms, and use of property for public educational purposes today means more than its devotion solely to academic ends. The same observations apply to the Illini Hall and Arcade properties. Recreational facilities are afforded students of the University and provision is made, likewise, for physical education classes in some of these buildings. The facts recounted disclose that the purpose motivating the acquisition and operation of these properties is neither revenue nor profit but is, primarily, to provide service of the kind and character demanded in the present day by students attending a large university. The fact that a charge is made for room rent, meals and other services is immaterial. The buildings do not thereby lose their character as a part of the educational institution of the University of Illinois for the adequate reason that the buildings are not used primarily to produce revenue. (*City of Chicago* v. *University of Chicago,* 228 Ill. 605.) As per-

tinently observed in the case last cited, "The fact that students are charged tuition fees, rent for the rooms occupied and the cost of food consumed does not affect the question. These items are all of the same character, and together constitute the charge of the university for the teaching and education of its students in its buildings and under its authority."

Club buildings used by students and alumni, although nominal dues are paid, as here, are used "in the immediate carrying on of the educational purposes of the university" when the payments are insufficient to "pay for the maintenance of the club." (*City of Chicago* v. *University of Chicago*, 228 Ill. 605.) The Union Building is essentially in the nature of a club where dues or fees are paid. As well said in *Elder* v. *Trustees of Atlanta University*, 194 Ga. 716, "It may be that a college could operate without * * * dormitories; but this would not prove that * * * dormitories * * * erected for and used by the authorities as a part of the equipment of the institution were not a part of the college and therefore were subject to taxation. * * * Some discretion must be given to the governing authorities of the institution to determine what buildings are necessary or proper to further their educational objectives."

The collector maintains, however, that the situation presented is, in substance, that of a private corporation, an independent entity, owning improved property which it does not itself operate but leases to the University of Illinois and obtains from the University an annual income out of which the Foundation discharges its obligations. From this, he insists, "Clearly the situation is no different than if the property were owned by an individual who leased his property and applied the rentals which he thus obtained to the payment of his debts." His position is untenable. Admittedly, property is not exempt from taxa-

tion merely because the income from it is used for an exempt purpose where the property itself is not so employed. (*Monticello Seminary* v. *Board of Review*, 249 Ill. 481.) The use to which property is devoted, as here, is decisive, rather than the use to which income derived from the property is employed. The distinction between investment and direct use for an exempt purpose has been well stated in *Wehrle Foundation* v. *Evatt*, 141 Ohio St. 467, where the court held that property which is used to produce income to be used exclusively for charitable purposes may not be exempted from taxation, the test being, instead, the present use of the property rather than the ultimate use of the proceeds derived from the property sought to be exempted. To the same effect is *People ex rel. Hesterman* v. *North Central College*, 336 Ill. 263, where this court held that the phrase in the applicable statute "with a view to profit" modifies both the word "leased" and the word "used" and, hence, that leasing, alone, does not divest property of its exempt character unless it be with a view to profit. Application of these tests to the case at bar discloses that the present use of each of the four properties is for at least one exempt purpose, namely, public education. The mere fact that a part of the enterprise yields an income—incidental profit—is but of little importance where, as here, the gross income and the entire property are used directly and exclusively for public educational purposes. (*Turnverein "Lincoln"* v. *Board of Appeals*, 358 Ill. 135; *People ex rel. Morse* v. *Order of Vikings*, 354 Ill. 447; *Congregational Publishing Society* v. *Board of Review*, 290 Ill. 108.) As pointedly stated in the case last cited: "It is not the use to be made of the profits but the nature of the business done that is to be considered in deciding the question of liability to taxation." Whatever income may be derived from the four buildings here is used to promote, and is incidental to, the primary

purpose, namely, to provide adequate facilities for university purposes,—in short, a "public educational purpose." The fact that some temporary incidental use is made of a relatively small portion of the property from which income is derived, as from the restaurant in the Arcade building, is immaterial.

The collector refers repeatedly to the income from the properties and directs attention to the payment of interest on the mortgage debts. A property may be actually and exclusively used for an exempt purpose although subject to an incumbrance where the total net income, if any, is devoted to exempt purposes. (*Grand Lodge of Masons* v. *Board of Review*, 281 Ill. 480.) All the income or revenue received by the Foundation is devoted to the basic purpose of the buildings. The collector's assertion that although legal title is in the Foundation "there is no trust created whereby the income from the properties is being used for educational purposes" is not a correct statement, or interpretation, of the facts. The record demonstrates that all income from the properties is used to maintain or operate them for educational purposes and to discharge obligations which, alone, can assure the continued availability of these properties for public educational use.

We are impelled to observe that sound reasons support the exemption from taxation of property devoted to public educational purposes. It is appropriate to note that institutions of higher learning have long been regarded as highly beneficial to the communities in which they are located. From a purely monetary viewpoint, the presence of colleges and universities such as the University of Illinois, with a large educational plant and thousands of students, increases the value, generally, of property in the community. This is particularly true where an educational institution is located in a smaller city or town rather than in a metropolitan area. In short, the presence of the Uni-

versity of Illinois, despite the tax-exempt status which a large part of its property enjoys, has no doubt resulted in business and residence property being worth considerably more in dollars and cents than in communities of comparable size. The University brings many benefits, and this factor is one underlying the exempt character of its property. These facts should be apparent to taxing officers, as well as to other persons.

It becomes unnecessary to consider the remaining contentions of the defendants (1) that the properties are exempt because in reality they are owned by the State of Illinois and (2) that the Foundation is a beneficent and charitable institution.

The judgment of the county court is right, and it is affirmed.

*Judgment affirmed.*