LEN H. SMALL *et al.*, as Trustees, Plaintiffs-Appellees, *v.* ELMER S. NELSON *et al.*, Defendants-Appellants.

(No. 73-269; ■■■■■■■

Third District—March 29, 1974.

John B. Cashion and Paul Davidson, both of Chicago, for appellants.

Will E. Eaken, of Kankakee, for appellees.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Plaintiffs, who are court appointed and supervised trustees under a testamentary trust known as the "Old People's Home Trust", brought this action in the Circuit Court of Kankakee County seeking to enjoin

county taxing officials from assessing, levying and collecting real estate taxes with regard to a trust property used for the operation of an old people's home. This appeal is from a summary judgment in favor of plaintiffs, and the issue presented is whether the property is exempt from taxation under our Constitution (Ill. Const. (1970), art. IX, sec. 6) and section 19.7 of the Revenue Act of 1939, as amended (Ill. Rev. Stat. 1971, ch. 120, par. 500.7), which implements the constitutional provision.

Facts gathered from the pleadings, affidavits and deposition filed in support of plaintiffs' motion for summary judgment show that the old people's home in question, called Heritage House, was constructed in 1969-1970 at a cost of about $1,200,000. Of this amount, $850,000 came from trust funds and the balance from a mortgage loan. Since completion, an additional $160,000 has been borrowed through junior mortgage loans. Persons who reside at the home are classified as "residents" (retired persons) and as "nursing residents" (persons who require nursing care). There are 68 rooms in all for occupancy. Fifty-two are for residents, five of which are semi-private, and the balance private. Nursing residents are housed in two separate wings of the building, each wing having eight rooms, all but one of which in each wing are semi-private. The nursing wings are licensed as a skilled nursing care unit by the Illinois Department of Health and are continuously staffed by qualified nursing personnel.

The home is self-sustaining and is not funded by any governmental unit or agency. None of its residents are public charges or supported by Federal or any other governmental assistance programs. No founder's or entrance fee is required, and while its present room rates are doubtless geared to liquidating its mortgage indebtedness, there is no profit motive in its operation. Along these lines, no allowance for depreciation of the home's structure is included in the fees paid by its residents.

Charges to "residents" range from $325 per month for a semi-private one-room apartment, to $615 per month for a two-room furnished, private apartment; charges to "nursing residents" range from $560 per month for an ambulatory minimum care patient, to $975 per month for total nursing care in a private room, the level of nursing care being determined by the resident's personal physician and the home's medical advisory committee. For the year ending September 30, 1972, the average charge to each "resident" was $425.36 per month, while the average for each "nursing resident" was $680.31 per month. The charges include meals, maid and cleaning service, linens, towels, use of laundry equipment and recreational areas, and what the rules and regulations incorporated into the admission agreement refer to as "availability of a regular nurse." They do not include drugs, medicine, medical, surgical

or hospital services, outside laundry or dry-cleaning, or "the usual nursing home or infirmary type nursing care." The first month's charges must be paid upon admittance and, in addition, a sum equivalent to two months' charges must also be advanced. The latter sum, however, is either returned in full or in part when a resident leaves the home, dependent upon the status of his or her account.

Admission to the home is open to persons of all races, creeds, and colors; however, the home reserves the rights to refuse admission or to discharge a person without giving any specific cause. Further, a resident who becomes mentally or emotionally disturbed may be transferred out of the home on five days' notice. Up to the date of this proceeding, the situation had never arisen where an applicant had been unable to pay the required charges, although it appears that two residents had moved out of the home of their own volition because of the rates. Similarly, denial of admission because of financial inability to pay the charges had never arisen, nor does it appear that the trustees had ever determined what the policy would be if confronted with a needy applicant. No resident has ever been put out for a failure to pay, the record showing once again that the home has never been confronted with a failure to pay.

Property tax exemption for charitable institutions is now derived from section 6 of article IX of the Constitution of 1970, which, in essence, is but a rephrasing of section 3 of article IX of the Constitution of 1870. In section 6 of article IX of the Illinois Constitution of 1970, it is provided in pertinent part: "The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes  *.  *   *". The statute directly applicable in the present case is section 19.7 of the Revenue Act of 1939, as amended, wherein the Legislature has accorded tax exemption to:

"All property of institutions of public charity, all property of beneficent and charitable organizations, whether incorporated in this or any other state of the United States, and all property of old peoples' homes, when such property is actually and exclusively used for such charitable or beneficent purposes and not leased or otherwise used with a view to profit; and all free public libraries. The words 'Old peoples homes' as used in this section shall include any old peoples' home licensed by the State of Illinois and owned by a not-for-profit corporation or organization and operated not for profit under the auspices of a religious, fraternal, charitable or other non-profit organization which old peoples'

home provides housing, meals, laundry and infirmary services to aged persons and which is financed wholly or in part by charges made to its residents or wholly or in part by endowment, gifts or bequests or by a combination of the foregoing." Ill. Rev. Stat. 1971, ch. 120, par. 500.7.

■■ Based upon the Constitution and the statute, several comparatively recent decisions of our supreme court furnish guidelines and criteria as to what constitutes exclusive use for a charitable purpose, insofar as old people's homes are concerned, *viz., Methodist Old Peoples Home v. Korzen*, 39 Ill.2d 149 (1968); *People ex rel. Nordlund v. Association of the Winnebago Home for the Aged*, 40 Ill.2d 91 (1968); and *Wesley Willows v. Munson*, 43 Ill.2d 203 (1969). (For convenience, these decisions shall hereinafter be referred to as the *Korzen, Winnebago,* and *Munson* cases.) At the same time, however, the decisions recognize that the concept of property use which is exclusively charitable does not lend itself to easy definition, and reassert the principle that each individual claim for tax exemption must be determined from the particular facts of the case. See also *Coyne Electrical School v. Paschen*, 12 Ill.2d 387; *People ex rel. Goodman v. University of Illinois Foundation*, 388 Ill. 363.

Each of the decisions also defined a charitable institution as "one which dispenses charity to all who need and apply for it, does not provide gain or profit in a private sense to any person connected with it, and does not appear to place obstacles of any character in the way of those who need or would avail themselves of the charitable benefits it dispenses". (*Korzen*, 39 Ill.2d at 157.) Thereafter, on the basis of the particular facts in each case, it was concluded that none of the old people's homes in question were entitled to tax exemption, first, because of obstacles to admission placed in the way of applicants to the homes, and, second, because their primary concern did not appear to be with the needy. Defendants insist that the same obstacles to admission and the same lack of concern with the needy exist in this case and contend that the trial court was therefore in error when it granted plaintiff's home tax exemption as a charitable institution. We do not agree with this contention.

In the *Korzen, Winnebago* and *Munson* cases, the greatest obstacle to admission, and one which we believe clearly was the predominant factor in the opinion of the court in each case, was a requirement for the payment of a sizeable founder's or entrance fee by persons seeking to enter the homes. For example, in *Korzen* applicants were required to pay a founder's fee ranging from $6,250 to $25,000; in *Winnebago* an entrance fee of $4,000 was required and, in addition, applicants had to assign their social security benefits and title to all their property to the

corporation operating the home; while in *Munson* a non-refundable application fee of $50 and a founder's fee ranging from $9,000 to $20,500 were required. No such obstacles to admission are present in this case. Plaintiffs do not discourage applicants, or impoverish them once accepted, by requiring a founder's fee or the assignment of property. Conversely, plaintiffs do not have a windfall fund provided by founder's fees from which taxes could be paid, but would necessarily have to pass such taxes on to its residents by an increase of monthly charges.

Health requirements were also found to be an obstacle to admission which detracted from the charitable character of the homes in *Korzen* and *Winnebago*, but we find no persuasive parallel in this case. In *Korzen*, where one of the corporate purposes was "to provide proper accommodations and care for the sick and homeless aged", the by-laws expressly provided; (1) that all applicants shall be in good mental, emotional and physical health, that they shall be free from communicable diseases, that they should be ambulatory, and able to see and hear well and take care of their personal needs; and (2) that persons would not be admitted who were senile, afflicted with insanity, epilepsy or other disease which, in the judgment of the medical staff and the superintendent, would be detrimental to the interest of the home. Less drastic were the health requirements in *Winnebago*, the opinion of the court stating only that the applicant "had to be in reasonable health, mentally capable, and had [to] pass a routine and not too detailed physical examination."

■■ While a deposition witness referred to a physical examination of applicants, we find nothing in the record of its scope or which permits us to conclude that it places undue or unreasonable restrictions upon an applicant's entry into the home. Rather, it is the tenor of plaintiffs' rules and regulations for its residents that admission would be denied only to applicants who require hospital services and treatment beyond the capacity of the nursing service available in the home. We do not read into section 19.7 of the Revenue Act a legislative intent that an old people's home must offer complete hospital and medical services before qualifying for tax exemption, nor, for reasons later apparent, do we believe that the constitutional requirement of "exclusive" use for charitable purposes requires such a result.

■■ As is true in the present case, the operator of the home in *Munson* reserved the right to remove an occupant of the home in the event of mental illness. But we fail to see in this reservation a detraction from a charitable purpose. Special facilities and personnel are required to treat and care for the mentally ill. To penalize an old people's home because it does not provide such care and treatment is, in our view, to exact a penalty for a failure to provide charitable benefits over and above those

normally provided for, or expected, in homes for the aged. So far as "exclusive" use and matters of health are concerned, we believe it unrealistic to say that old people's homes must assume total responsibility for the mental care and treatment of its residents in order to have a charitable purpose.

■■ The *Korzen, Winnebago* and *Munson* cases also meet with the present case on common grounds, first, in that monthly charges are made to residents for their living quarters and services furnished, and, second, in that the admission of needy persons was either negligible or nonexistent. In our opinion, however, under the facts here present, these factors do not detract from the charitable character of plaintiff's home or serve as a basis to deny it tax exemption. Particularly is this true when it is remembered that plaintiffs, unlike the homes in the cited cases, do not have the substantial sums produced by founder's or entrance fees to draw upon for the treatment of the needy, or to meet increases in operating expenses, when the need arises.

■■ Speaking in *People v. Young Men's Christian Association*, 365 Ill. 118, 122, our supreme court stated: " 'Charity', in law, is not confined to the relief of poverty or distress or to mere alms giving but embraces the improvement and promotion of the happiness of man. A charity is a gift to the general public use which extends to the rich as well as to the poor." In the same case, and in many others, it has been held that charging fees and dispensing benefits to other than those who are not poverty stricken does not cause an institution to lose its charitable character. (See *Korzen; Winnebago; Sisters of the Third Order of St. Francis v. Board of Review*, 231 Ill. 317; *People ex rel. Cannon v. Southern Illinois Hospital Corp.*, 404 Ill. 66.) We believe these principles have singular application and significance here. From the record, two things are apparent. First, that in order to build the home it was necessary for the plaintiffs to virtually exhaust the funds of the trust and to incur substantial mortgage indebtedness, a circumstance which assumes greater significance in the context of a charitable gift and use when it is recalled that charges to residents do not include depreciation of the home's structure. Second, monthly room charges are the only fees paid by the residents, and the monies produced thereby are the only fund available to plaintiffs for operating expenses and debt retirement. Under these circumstances, in our opinion, the payment of reasonable charges, and the fact that needy patients are not presently being accommodated do not alter the charitable character of the home.

■■ Tested by the practical realities and necessities of our times, we believe it manifest that a completely not-for-profit old people's home such as we have here is providing a benefit to mankind, and offering a

service which tends to lessen the burdens of government. It is common knowledge that there is growing concern, at almost every level of government, as to the problems of shelter, food, care and the social status of the elderly. More and more otherwise self-sustaining people are being compelled to leave the work force at an earlier age, and, in this time of high costs and taxation on the bare necessities of life, they find all too soon that social security and pension benefits relied upon to sustain them in their declining years are insufficient to permit them to maintain their homes and still enjoy a reasonable standard of living. Cognizant of this, the Federal government has increased social security benefits, and our own Legislature has searched for means to give property tax relief to the elderly. The availability of an old people's home operated at reasonable rates and not for profit permits the elderly person of limited means to husband those means more wisely and postpones the day that such person might become a public charge. Property taxes, insurance, cost of utilities and all other expenses of maintaining a residence disappear, and food need no longer be purchased at high cost to an individual. Apart from the economic benefits, homes for the elderly afford social contacts and recreation which might not otherwise exist for its residents. All of these considerations, we believe, coupled with plaintiffs' mode of operation and financial structure, lead to the conclusion that the home here involved is charitable in nature and is being used exclusively for a charitable purpose.

The judgment of the Circuit Court of Kankakee County granting tax exemption to plaintiffs' Old People's Home Trust was proper and it is accordingly affirmed.

Judgment affirmed.

SCOTT, P. J., and DIXON, J., concur.