SOUTHERN ILLINOIS UNIVERSITY FOUNDATION *et al.*, Plaintiffs-Appellants, *v.* SHIRLEY DILLINGER BOOKER, County Treasurer, *et al.*, Defendants-Appellees.

Fifth District    No. 80-578

Opinion filed August 4, 1981.

Kimmel, Huffman, Prosser & Kimmel, Ltd., of Carbondale, for appellant Southern Illinois University Foundation.

Richard G. Higgerson and Shari R. Rhodes, both of Office of Legal Counsel, Southern Illinois University, of Carbondale, for appellant Board of Trustees of Southern Illinois University.

John R. Clemons, State's Attorney, of Murphysboro (Paul D. Baertschi, Assistant State's Attorney, of counsel), for appellees.

Mr. JUSTICE JONES delivered the opinion of the court:

This appeal arises out of an action brought to enjoin and restrain the defendants, who include the supervisor of assessments, the treasurer and the State's Attorney of Jackson County, from collecting or attempting to collect real estate taxes assessed against certain real estate in Jackson County commonly known as Evergreen Terrace. Evergreen Terrace consists of 38 buildings providing family housing for married students who attend Southern Illinois University-Carbondale. The title to the property is in the name of the plaintiff Southern Illinois University Foundation, an Illinois not-for-profit corporation, which leases the property to the plaintiff Board of Trustees of Southern Illinois University.

From the trial court's order denying a permanent injunction plaintiffs appeal raising two principal issues. Plaintiffs contend that the property is tax exempt pursuant to section 19.5 of the Revenue Act of 1939 (Ill. Rev. Stat. 1979, ch. 120, par. 500.5), which exempts from taxation property "belonging to the State of Illinois." In the alternative plaintiffs maintain that the property is tax exempt pursuant to section 19.1 of the Revenue Act of 1939 (Ill. Rev. Stat. 1979, ch. 120, par. 500.1), which exempts from taxation property of schools used "exclusively for school purposes, not leased by such schools or otherwise used with a view to profit including, but not limited to, student residence halls, dormitories and other housing facilities for students and their spouses and children."

Defendants argue that plaintiffs cannot assert on appeal that the property in question is the property of the State of Illinois because they

failed to advance that theory in the trial court. Plaintiffs deny having failed to raise the issue. We note that section 19.1, relating to the exemption for exclusive use for school purposes, requires that exempt property must not be "leased by such schools or otherwise used with a view to profit." The relationship between Southern Illinois University Foundation and Southern Illinois University is a close one. That closeness is reflected not only in the name of the Foundation but also in its bylaws, which are included in the record on appeal and will be discussed shortly. In view of the close relationship in this case between the lessee school and the lessor foundation, we think it is necessary to ascertain the precise nature of the relationship between the two in the transaction at hand. By doing so we may determine the interest of each in the disputed property and, ultimately, whether the status of the incidence of ownership is such as to bring the property within the exemption provided by section 19.1. Thus, the question of ownership under the circumstances presented in this case is implicit in the question of exclusive use of the property for school purposes and must be considered by the court in order to dispose of the issues presented. It is of no moment whether the issue of ownership by the State was expressly raised in the trial court.

Pending in this court is plaintiffs' motion to supplement the record on appeal with a bystander's report by which plaintiffs seek to show that they expressly raised in the trial court the issue of State ownership of the property. In view of our conclusion that the question of ownership is implicit in the question of exclusive use of the property for school purposes, it is not necessary that plaintiffs show they expressly raised the issue in the trial court, and we therefore deny their motion to supplement the record on appeal.

According to the bylaws of the Southern Illinois University Foundation, it is a "wholly not-for-profit corporation" whose "purpose shall be wholly charitable and educational." Its expressed corporate purposes include, among other things, "to buy, sell, lease, own, manage, convey, and mortgage real estate" and "[i]n a manner specified by the Board of Trustees of Southern Illinois University, to act as the business agent of the said Board in respect to * * * [a]cquisition, management and leasing of real property and buildings." The final purpose of the Foundation which is set forth in the bylaws is expressed as follows: "To do such other acts and undertake such other enterprises as in the judgment of the Board of Directors shall tend to promote the interests and welfare of the Southern Illinois University."

With respect to the corporate organization of the Foundation, the bylaws provide that the affairs of the corporation shall be managed in accord with policies and directions established by a board of directors, of whom there shall be 11, consisting, among others, of the president of

Southern Illinois University at Carbondale or his designee, "[t]he member of the Board of Trustees of Southern Illinois University designated to serve on the Executive Committee of the Board of Governors of the SIUF at Carbondale under these Bylaws," and "[t]he Chief of Board Staff of Southern Illinois University or his designee." The bylaws provided as follows for a board of governors:

"Section 3. *Division Board of Governors.* Each of the two permanent divisions of the corporation shall be governed by a Board of Governors which shall manage the affairs of the respective Divisions [of the corporation, known as 'The SIU Foundation at Carbondale' and 'The SIU Foundation at Edwardsville'], subject to policies and directions to be provided by the Board of Directors * * *. Each such Board of Governors shall be composed of the following classes and number of Governors:

A. Ex-Officio Governors: The following persons shall be ex-officio Governors and shall serve and have full voting powers for so long as they hold the respective offices enumerated below:

(1) The Chairman of the Board of Trustees of Southern Illinois University shall designate two Trustees to serve on the Board of Governors for the SIUF at Carbondale and two Trustees to serve on the Board of Governors for the SIUF at Edwardsville.

(2) The President of each University governed by the Board of Trustees of Southern Illinois University and a designated representative of each such President shall be members of the Board of Governors corresponding to his University.
* * *

(4) The Chief of Board Staff of Southern Illinois University and a designated representative of the Chief of Board Staff shall serve on each of the respective Boards of Governors."

Also included in the record on appeal are numerous stipulations of fact by the parties. We quote those that are pertinent to the issue of ownership insofar as they set forth the details of the transaction with which we are here concerned between the Foundation and the University:

"7. The Foundation acquired title to [Evergreen Terrace] by warranty deed from the Board of Trustees of Southern Illinois University, dated July 1, 1967, for the purpose of financing the building of residence halls and other housing facilities for the use of students and their spouses and children of Southern Illinois University at Carbondale.

8. [Evergreen Terrace] and the residence halls and housing facilities constructed thereon have at all times since their completion been operated by the Board of Trustees of Southern Illinois

University and used by the University as a student family housing facility for low and moderate income University students and their spouses and children. The control and operation of the housing facilities are and have been at all times referred to herein under the jurisdiction of the University.

\* \* \*

10. The Foundation financed the cost of construction of the Evergreen Terrace housing facilities through a mortgage agreement with the Federal Housing Administration as a low and moderate income family housing project.

11. The University has, since deeding the said property to the Foundation paid, and continues to pay, as rent for the property, an annual sum of money representing the amount necessary to pay the financing obligations on the property. This sum ($188,125.68 per annum for FY 1971 through FY 1976) has been transmitted by the University, as agent for the Foundation, to the Federal National Mortgage Association, from funds derived from the operation of Evergreen Terrace.

12. At the time of transfer of title to the property from the University to the Foundation in 1967, separate resolutions were passed by both corporate bodies, stating that upon retirement of the mortgage, the Foundation will reconvey the property as improved to the University without further cost to the University, and that the University will continue to operate the project as a student family housing facility.

13. The University and the Foundation on August 1, 1978, entered into a written lease agreement, formalizing the terms of the lease agreement which have verbally been understood to exist and govern the actions of the University and the Foundation since 1967 with respect to the Evergreen Terrace property. \* \* \*

14. The control and operation of the Evergreen Terrace housing facility is under the jurisdiction of the Southern Illinois University at Carbondale Housing Office. The Evergreen Terrace housing facility is managed by the Housing Office in the same manner as all other on-campus University student housing facilities. The University provides on-campus housing for four thousand six hundred ninety-one (4,691) single students and has family housing units for approximately five hundred seventy-six (576) students, which includes spaces for three hundred four (304) students and their families at Evergreen Terrace.

\* \* \*

16. Police and security services for the Evergreen Terrace housing area are provided by the Southern Illinois University

Security Office. The University's security officers patrol and exercise authority over the area in the same manner as for other University housing facilities. The University's Physical Plant Office provides maintenance service for the Evergreen Terrace housing facility in the same manner as is done for other University housing facilities."

In their brief plaintiffs explain more fully the reason why the Foundation acquired title to the property:

"One way to meet [the] ever growing need for married student housing was through loans funded through the Federal Housing Administration under Section 221(d)(3) of the National Housing Act of 1961. * * * Such a loan arrangement required the property owner to enter into a long term loan, an obligation which the University was legally prohibited from incurring. The Foundation, on the other hand could incure [*sic*] such long term debts, since its bylaws provided for such loan arrangements, as part of the basic Foundation goal of assisting the University."

Defendants take the position that "ownership" for tax purposes requires "actual, legal ownership, * * * not something equivalent or nearly equivalent thereto." Plaintiffs, on the other hand, maintain that equitable ownership of property by the State is sufficient to exempt it from taxation by units of local government. For the contention that legal ownership is necessary for exemption from taxation, defendants rely principally upon *People ex rel. Olmsted v. University of Illinois* (1927), 328 Ill. 377, 385, 159 N.E. 811, 814, quoting this sentence:

"From these authorities the rule is to be deduced that ownership of property in the State, such as exempts that property from taxation, must be exclusive and free from any kind of legal or equitable interest in anyone else."

In *Olmsted* farm property had been given in trust to the trustees of the University of Illinois by a deed of trust that provided for loans to be made out of the net income and the trust estate to certain students taking certain courses. The deed of trust further provided that the grant was made on the express condition that the property could never be sold except under certain conditions and in certain ways. The court found this property not exempt as State property for reasons set forth immediately after the statement of the rule defendants have quoted. These reasons, which we now quote, show that by "an interest in anyone else" the court meant *an interest in someone or something other than the State*:

"If the State holds property as trustee, not for the public but for the benefit of specified private persons, such property cannot be said to belong to the State so as to exempt it from taxation. It seems clear that the State does not have exclusive ownership of the

property involved here. It may not sell it except under the terms, in the manner and for the purposes indicated in the trust. It may not exercise complete control over it even for the purposes set forth in the deed of trust, since that deed specifies the management of the farms shall be by a committee consisting of members of the faculty of the university who are not a part of the board of trustees, and not, therefore, a part of the body corporate of the university. It further appears in the application of this test, that, acting as trustee, the State, through the board of trustees of the university, does not hold the property in trust for the public, but that a certain class of specified private persons are the only ones to receive beneficial interest therefrom. The State cannot, therefore, be said to own the property to the exclusion of any legal or equitable interest in anyone else." (328 Ill. 377, 385, 159 N.E. 811, 814.)

In the later case of *Ford Motor Co. v. Korzen* (1964), 30 Ill. 2d 314, 322, 196 N.E.2d 656, 660, *cert. denied* (1964), 379 U.S. 837, 13 L. Ed. 2d 44, 85 S. Ct. 73, the Supreme Court of Illinois commented upon its holding in *Olmsted*, saying it had held there that "if an agency of the State holds property as trustee, not for the public, but for specified private persons, such property does not belong to the State so as to exempt it from taxation." The court did not, however, suggest, nor do we find any reason to think, that *Olmsted* stands for the proposition that in order for property to be exempt from taxation as belonging to the State, title to it must be in an agency of the State.

In *Olmsted* the court did say that although the State had created a body corporate to control the University of Illinois, the State nevertheless retained the power of selecting trustees and might through agents other than the trustees sell and dispose of the property of the institution or change its charter as the legislature might direct. The court concluded that the property of the University of Illinois, though held by the board of trustees, belonged to the State. So too in the case at bar, although the State has created a body corporate to control Southern Illinois University, the State has retained the same crucial powers. Thus, we may likewise conclude that the property of Southern Illinois University, though held by the board of trustees, belongs to the State of Illinois. Therefore, any equitable interest created in the University by virtue of the transaction between the Foundation and the University is held by the State of Illinois.

Since any equitable interest is unquestionably in the State, only the legal interest held by the Foundation poses any problem with respect to the application of the tax exemption for property belonging to the State. Although courts in Illinois have not addressed the precise issue of whether legal title in an entity other than the State defeats this exemption, case law

treating similar revenue matters is helpful in resolving the question before us.

Revenue collection, it was said in *People v. Chicago Title & Trust Co.* (1979), 75 Ill. 2d 479, 389 N.E.2d 540, is concerned not with the refinements of title but with the realities of ownership. The court in that case stated,

> "Title to property does not necessarily involve ownership of the property. Title refers only to a legal relationship to the land, while ownership is comparable to control and denotes an interest in the real estate other than that of holding title thereto. Restatement (Second) of Trusts sec. 2, comment *d*, and sec. 10, comment *a* (1959).
>
> The key elements of ownership are control and the right to enjoy the benefits of the property. This is especially true in tax law, where the taxpayer pays 'a portion of the expense incurred in the protection of his person or property * * *.' " (75 Ill. 2d 479, 489, 389 N.E.2d 540, 544.)

In that case, which dealt with the tax liability of beneficiaries of land trusts, after an analysis of various cases, the court concluded,

> "Taken together, these cases indicate a clear policy of the tax statute to look beyond the mere holder of title for a determination of ownership. While title may be a factor in determining ownership it is not decisive. Of far greater importance is control of the property and the right to its benefits." 75 Ill. 2d 479, 492, 389 N.E.2d 540, 549.

In the case of *In re Application of County Collector* (1976), 44 Ill. App. 3d 327, 357 N.E.2d 1302, in which a common law dedication to a village created a perpetual easement on behalf of the public, the village prevailed in its claim that the property was exempt from taxes. Although this case, like *Chicago Title & Trust*, involved no claim of State ownership of property, part of the reasoning used in it is likewise applicable to our question:

> "The purpose and object of the exemption provisions of the Revenue Act are to free property controlled and used by public bodies for public use from the burden of taxation. * * *
>
> * * * For practical purposes, the possession and control the Village has over the land as a result of the perpetual easement is not unlike that an owner of a fee simple title would have." 44 Ill. App. 3d 327, 332, 357 N.E.2d 1302, 1306-07.

In *Christian Action Ministry v. Department of Local Government Affairs* (1978), 74 Ill. 2d 51, 61-62, 383 N.E.2d 958, 963-64, where the court considered the tax-exempt status of certain property used exclusively for

charitable purposes, the court expressly disagreed with the contention of the Department that

"* * * only legal title will satisfy * * * [the] requirement of ownership. * * *

* * * [W]e believe that equitable ownership of property, used exclusively for charitable purposes, by a charitable organization is readily accommodated by section 19.7 of the Revenue Act of 1939 (Ill. Rev. Stat. 1975, ch. 120, par. 500.7). * * * The facts plainly demonstrate substantial interest in the property justifying a determination of tax-exempt status on the basis of equitable ownership * * *."

In conclusion the court remarked,

"We are not expanding the area of qualification for tax exemptions. Where the legislature requires legal ownership, that obviously must be respected. Where it does not, actual ownership, legal or equitable, is proper. The facts in this case evidence ownership such as contemplated by the legislature." 74 Ill. 2d 51, 63, 383 N.E.2d 958, 964.

Bearing these principles in mind, we observe that section 19.5, which provides a tax exemption for "[a]ll property of every kind belonging to the State of Illinois," like section 19.7, does not expressly require legal ownership of the property. With respect to control and enjoyment of the benefits of the property, the stipulated facts show that the University, not the Foundation, in fact controls the property and has the right to enjoy the benefits of it in the manner of an owner in fee simple absolute. The Foundation acquired title to the property from the University solely as a convenience to the University with regard to long-term financing. The property is used to house students of the University. The facilities are controlled, operated and maintained by the University. From funds derived from the operation of the property the University pays annually as rent the amount of the Foundation's mortgage payment and, as agent of the Foundation, transmits that sum to the Federal National Mortgage Association. Furthermore, when the mortgage is eventually retired, the University will receive title to the improved property with no further payment whatsoever required as consideration for the transfer. The Foundation holds but naked legal title to property plainly controlled and enjoyed by the University and, hence, the State.

■■ Unlike the beneficiaries of the trust in *Olmsted*, who were specific private persons entirely and unquestionably separate from the State, Southern Illinois University Foundation is not readily separable from the University and, consequently, the State. Although the Foundation is a corporate entity legally distinct from that of the University, the function of the one is expressly "to promote the interests and welfare" of the other,

and some of the highest officers of the University are required, under the bylaws of the Foundation, to serve in some of the highest positions of the Foundation. Thus, a further reality of the ownership of this property is the identification to a certain extent between the holder of bare legal title and the State as holder of the entire equitable interest. In this case, then, not only does the Foundation hold but naked legal title to property controlled and enjoyed by the State, but a certain identity exists as well between the holder of naked legal title and the State. For these reasons we hold the property exempt from taxation as property belonging to the State.

In view of this holding it is unnecessary for us to consider the question of whether the property is exempt from taxation pursuant to section 19.1. Nevertheless, because of the importance we attribute to the case, we elect to do so. To that end we quote again from the stipulations of fact by the parties, this time those that are pertinent to the issue of exclusive use of the property for school purposes:

"18. The operation of the Evergreen Terrace housing facility, at all times relevant to this proceeding, has not resulted in any net profits to the University or the Foundation.

19. All occupants of the Evergreen Terrace housing facility are required to enter into a lease, designated 'family housing contract,' * * *.

20. The University has at all times relevant to this proceeding maintained a policy, stated in the above-referenced lease, that a condition for eligibility for tenancy at Evergreen Terrace is that an applicant be a registered full-time student at Southern Illinois University at Carbondale. The University has at all times implemented this policy by requiring that an applicant submit a paid fee statement or some other evidence of registration as a student.

21. The lease or family housing contract contains a provision * * * that the lease is subject to termination when a student lessee fails to remain enrolled for at least two academic terms during each calendar year of residence.

22. During the years 1971 through 1976, no tenant evictions resulted solely from a failure on the part of a tenant to continue to remain enrolled as a student of the University. No such actions were taken due to a policy of the Federal Housing Administration, communicated to the University on several occasions, that while the University may require student enrollment for initial occupancy in the Evergreen Terrace apartments, it could not evict a resident for failure to remain a student. The FHA, however, in April 1977, advised the University that it will now permit the University to require continued student status as a condition of continued residency at Evergreen Terrace. Subsequently, the

University advised all residents that this condition will now be enforced so that no contracts will be renewed for nonstudent tenants.

23. Prior to receiving the above-referenced permission from FHA, the University made only periodic reviews to determine the number of nonstudent residents. Since April 1977 the University has conducted regular and on-going reviews to ensure that the student enrollment requirement is being maintained by residents of Evergreen Terrace.

24. For the years 1971-1976, University records reflect that the 304 apartment units at Evergreen Terrace were occupied by the following numbers and corresponding percentages of University students, faculty-staff members, and persons not affiliated with the University, during each particular year (based upon records for residents during the fall quarter or semester of each year):

| 1971 | | | 1972 | | |
|---|---|---|---|---|---|
| *Students* | *Staff* | *Non. Aff.* | *Students* | *Staff* | *Non. Aff.* |
| 299 (98.3%) | 3 (1.0%) | 2 (.7%) | 286 (94.1%) | 5 (1.6%) | 13 (4.3%) |
| 1973 | | | 1974 | | |
| *Students* | *Staff* | *Non. Aff.* | *Students* | *Staff* | *Non. Aff.* |
| 296 (97.4%) | 3 (1.0%) | 5 (1.6%) | 292 (96.0%) | 2 (.7%) | 10 (3.3%) |
| 1975 | | | 1976 | | |
| *Students* | *Staff* | *Non. Aff.* | *Students* | *Staff* | *Non. Aff.* |
| 287 (94.4%) | 4 (1.3%) | 13 (4.3%) | 280 (92.1%) | 5 (1.6%) | 19 (6.3%) |

25. The category of 'students' in the above figures are those individuals who were enrolled for classes at Southern Illinois University at Carbondale during at least one quarter or semester of the particular year. Individuals included within the category of students did not necessarily meet the residency requirements found in the lease [referred to above] * * *. The category of 'non-affiliated' in the above figures all were enrolled as students or had presented evidence of registration as students at the time of original admission to Evergreen Terrace. A number of residents who were not enrolled as Southern Illinois University students during the particular year in question were enrolled as students during the previous or following year."

We have examined the transcript of proceedings in which testimony was taken with respect to these matters and have found that at the hearing essentially the same facts as those stipulated were reiterated. We have found nothing of substance testified to at the hearing that was not already included in the stipulations of fact quoted above.

Among the trial court's findings were the following:

"(5) Since Evergreen Terrace is used to house families of students and staff rather than to house solely students, the burden on the local taxing bodies, particularly local school districts, would be increased more than if only full time students at the University were housed in the apartments as they are in dormitories.

Secondly, the educational benefit, if any, resulting from the housing of families of students should be no greater than the educational benefit, if any, resulting from the housing of faculty members.

Therefore, the educational purposes of the operation and maintenance of Evergreen Terrace would appear to be secondary to the primary purpose of housing families of students and staff.

(6) The Plaintiffs * * * have failed to meet their burden of proving that the operation of Evergreen Terrace is tax exempt for the years in question as property used exclusively for school purposes as is required by Chp. 120, Section 500.1, Il. Rev. Stat."

Courts in Illinois have not considered the issue of whether property used as family housing for married students may be tax exempt as property used exclusively for school purposes. The parties have cited cases from other jurisdictions to support their respective positions. We have considered the cases cited but conclude, as did the court in *MacMurray College v. Wright* (1967), 38 Ill. 2d 272, 230 N.E.2d 846, that they are not pertinent under the constitution and expressed policies of Illinois.

Section 6 of article IX of our constitution provides in part:

"The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes." (Ill. Const. 1970, art. IX, §6.)

The General Assembly has exempted from taxation—and here we set out fully that part of section 19.1 relating to the tax exemption for exclusive use for school purposes:

"* * * all property of schools, including the real estate on which the schools are located and any other real or personal property used by such schools exclusively for school purposes, not leased by such schools or otherwise used with a view to profit, including, but not limited to, student residence halls, dormitories and other housing facilities for students and their spouses and children, and staff housing facilities; * * *."

The statute must be strictly construed, debatable questions being resolved in favor of taxation. (*People ex rel. Goodman v. University of Illinois*

*Foundation* (1944), 388 Ill. 363, 58 N.E.2d 33.) However, in ascertaining whether the use of property for an exempt purpose is exclusive, a court must not give the statute an unreasonably narrow construction. (*Goodman.*) As was said in *Goodman,*

> "The determination of the question whether a designated parcel of property is exempt from taxation requires a consideration of the particular factual situation presented. The primary use to which the property is devoted, and not its secondary or incidental use, is controlling." 388 Ill. 363, 370, 58 N.E.2d 33, 37.

In Illinois, property used by universities and colleges for dormitories has long enjoyed tax-exempt status as property used exclusively for school purposes. (See *Goodman; People ex rel. Hesterman v. North Central College* (1929), 336 Ill. 263, 168 N.E. 269.) Dormitories exclusively used by students are considered an essential part of universities and colleges, devoted to the purposes that these institutions attempt to accomplish. Their primary use, then, is educational rather than residential. On the other hand, the use of property to house faculty and staff of a college has been held primarily residential rather than educational so that the property was denied tax-exempt status. *MacMurray.*

■■ We have considered the question at length and have concluded that we must respectfully disagree with the trial court that the educational benefit to be derived from housing married students is no greater than that to be derived from housing faculty members. Without belaboring the point, we think that married students, for purposes of the comparison with faculty members, are first and foremost students. They are, therefore, more nearly analogous to single students, whose dormitory housing, as we have said, has long enjoyed tax-exempt status in Illinois. Married students seeking an education seem analogous to faculty members, for purposes of this comparison, only insofar as faculty members are often married and raising families. Faculty members, however, have usually completed their educations and are obviously employed, whereas students, by their very nature, have not completed their educations and are, if not unemployed, generally living on quite limited incomes. If a student cannot both attend school and afford to support his or her family in private housing, family obligations being what they are, the student cannot attend school, at least in the absence of low-cost family housing of the kind in issue here. Similarly, if a student cannot find available private housing for his or her family in a community crowded by students seeking housing not provided by the educational institution itself, the student cannot attend school. Therefore, we consider married student housing as necessary to the education of a married student as single-student housing is to a single student. Since the use of dormitory housing, serving essentially single students, is deemed primarily educational rather than resi-

dential, the use of family housing for married students should likewise be deemed primarily educational, and such property should enjoy tax-exempt status.

The trial court expresses concern with respect to the use of the property during the period from 1971 through 1976 to house staff as well as students. We notice from the material included in paragraph 24 of the stipulations of fact quoted above that never did the percentage of staff residing at Evergreen Terrace during that time amount to more than 1.6 percent. In *Goodman* the court considered the effect of the occasional use by the public of the various facilities of the Union building upon the exemption for exclusive use of the property for school purposes. The court stated that "[i]f the property is devoted to a purpose exempt within the contemplation of the law, an incidental use of its facilities for another purpose, when not for profit, does not defeat the exemption" (388 Ill. 363, 370-71, 58 N.E.2d 33, 37) and concluded that the use by the public was an incidental one for noneducational purposes that did not defeat the exemption. Similarly, we do not think that the incidental use by staff here of facilities used primarily by students for educational purposes during the period of time from 1971 to 1976 should defeat the exemption for those revenue years. Although the trial court does not in his findings refer to the use of these facilities during those years by "non-affiliated" persons, described above in the quoted stipulations of fact, we think that since their use of the facilities at most exceeded not more than 6.3 percent, the same may be said of the incidental use they made of these facilities.

We appreciate the trial court's concern with respect to the burden placed upon local taxing bodies by an exemption for property used to house the spouses and particularly the children of married students. However, we think the observation of the court in *Goodman* on this matter is especially applicable to the case at bar, where the educational institution has a large educational plant and thousands of students and is located in a small city rather than in a metropolitan area:

"We are impelled to observe that sound reasons support the exemption from taxation of property devoted to public educational purposes. It is appropriate to note that institutions of higher learning have long been regarded as highly beneficial to the communities in which they are located. From a purely monetary viewpoint, the presence of colleges and universities such as the University of Illinois, with a large educational plant and thousands of students, increases the value, generally, of property in the community. This is particularly true where an educational institution is located in a smaller city or town rather than in a metropolitan area. In short, the presence of the University of Illinois, despite the tax-exempt status which a large part of its property enjoys, has no

doubt resulted in business and residence property [sic] being worth considerable more in dollars and cents than in communities of comparable size. The University brings many benefits, and this factor is one underlying the exempt character of its property. These facts should be apparent to taxing officers, as well as to other persons." 388 Ill. 363, 375, 58 N.E.2d 33, 39.

In conclusion, we observe that our usual reluctance to reverse the judgment of a trial judge who sits as the trier of fact need not be stringently adhered to where, because the facts upon which the court made its determination were essentially stipulated, there were virtually no decisions to be made by the court as to the credibility of witnesses.

Reversed.

HARRISON and WELCH, JJ., concur.