Filed 8/26/08                    NO. 4-07-0763

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

PROVENA COVENANT MEDICAL CENTER and       )       Appeal from
PROVENA HOSPITALS,                         )       Circuit Court of
        Plaintiffs-Appellees,            )       Sangamon County
        v.                               )       No. 06MR597
THE DEPARTMENT OF REVENUE OF THE STATE      )
OF ILLINOIS; and BRIAN A. HAMER, in His Official )
Capacity as Director of the Illinois Department of )       Honorable
Revenue,                                   )       Patrick J. Londrigan,
        Defendants-Appellants.            )       Judge Presiding.
_____

PRESIDING JUSTICE APPLETON delivered the opinion of the court:

Provena Hospitals (Provena) brought an action for administrative review

of a decision by the Director of the Illinois Department of Revenue (Department) that

Provena's property, Provena Covenant Medical Center (Covenant) in Urbana, Illinois,

did not qualify for an exemption from property taxes. The circuit court reversed the

Director's decision, holding that Covenant was used primarily for charitable and

religious purposes and, therefore, was exempt under sections 15-65(a) and 15-40(a)(1)

of the Property Tax Code (35 ILCS 200/15-65(a), 15-40(a)(1) (West 2002)). We reverse

the circuit court's judgment because we find no clear error in the Director's decision.

I. BACKGROUND

Covenant is a not-for-profit, full-service, general acute-care hospital. As a

noncorporate subdivision of Provena, Covenant has no separate legal identity of its own.

Covenant is the property, and Provena is the owner. According to an organizational

chart in the record (applicant's exhibit No. 153), Provena owns five other hospitals

besides Covenant, but those other hospitals are not at issue in this case.

Provena applied to the Champaign County Board of Review to exempt Covenant from property taxes for 2002 on the ground that Covenant was used primarily for charitable purposes (35 ILCS 200/15-65(a) (West 2002)). (Actually, Covenant was nominally the applicant, but because Covenant is not a legal "person," we consider Provena to be the real applicant.) The board of review recommended denying the application, and in February 2004, the Director followed that recommendation.

Provena paid $1.1 million in property taxes under protest and requested an administrative hearing. In the hearing before the Department's administrative law judge (ALJ), Provena raised an additional ground for exemption besides charitable purposes (35 ILCS 200/15-65(a) (West 2002)): it claimed that as a health-care ministry of the Roman Catholic Church, Covenant was used primarily for religious purposes (35 ILCS 200/15-40(a)(1) (West 2002)). The ALJ submitted to the Director a decision recommending an exemption on the sole grounds that Provena was a charitable institution and its property, Covenant, was used primarily for charitable purposes. The ALJ did not reach the issue of whether Covenant was used primarily for religious purposes as well.

The Director disagreed with the ALJ's recommendation and denied an exemption for charitable uses. The primary reason for his decision was that in 2002, the tax year in question, Covenant devoted only 0.7% of its total revenue to charity care. Of 110,000 admissions in 2002, Covenant gave free care to only 196 patients and dis-counted care to only 106 patients; and Covenant hired collection agencies to recover the remaining balances from 64 of the patients to whom it had given discounts. Without

explanation, the Director also denied an exemption for religious uses.

Provena filed a complaint for administrative review. It argued to the circuit court that under the supreme court's decisions, charities were not defined by percentages and that, in any event, Covenant dispensed an ample amount of charity to the community in forms other than charity care. Covenant had a charity-care policy based on federal poverty guidelines, and it advertised the availability of "financial assistance." According to Provena, Covenant gave this financial assistance to every patient who needed and requested it, and the number of indigent people who walked in through the door and availed themselves of the charity-care policy simply was beyond Covenant's control. Also, Provena argued, considering the meager rates of reimbursement the government paid, treating Medicare and Medicaid patients was itself an act of charity. Provena further argued--indeed, the parties had stipulated--that Covenant was a faith-based institution founded, organized, owned, and operated as an apostolic mission and health-care ministry of the Catholic Church. The circuit court concluded that Covenant was entitled to both a charitable and religious exemption, and it reversed the Director's decision.

This appeal followed.

## II. ANALYSIS

### A. Standard of Review

We review the Department's decision, not the circuit court's decision. Calvary Baptist Church of Tilton v. Department of Revenue, 349 Ill. App. 3d 325, 330, 812 N.E.2d 1, 4 (2004). The parties disagree on our standard of review. The Department argues we should review its decision for clear error. Provena argues we should

review the Department's decision de novo. It is crucial, at the outset, to identify the applicable standards of review, for they often determine the results on appeal--indeed, a reviewing court does not even have the means of deciding an issue until it first identifies the standard of review.

Formerly, the rule was that "[if] facts [were] undisputed, *** a determination of whether property [was] exempt from taxation [was] a question of law." Chicago Patrolmen's Ass'n v. Department of Revenue, 171 Ill. 2d 263, 271, 664 N.E.2d 52, 56 (1996); see also City of Chicago v. Illinois Department of Revenue, 147 Ill. 2d 484, 491, 590 N.E.2d 478, 481 (1992); Harrisburg-Raleigh Airport Authority v. Department of Revenue, 126 Ill. 2d 326, 331, 533 N.E.2d 1072, 1073 (1989). To the extent the facts were disputed, courts decided whether the Department's factual findings were against the manifest weight of the evidence. Branson v. Department of Revenue, 168 Ill. 2d 247, 264, 659 N.E.2d 961, 969-70 (1995). Thus, on administrative review of the Department's decision to grant or deny an exemption, any given issue fell into either the category of fact or the category of law.

In City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998), the supreme court identified, for the first time, a third type of question a court could ask on administrative review: a question that was neither purely factual nor purely legal but one of fact and law mixed together. The supreme court decided that because the case required "an examination of the legal effect of a given set of facts, it [presented] a mixed question of fact and law" and the supreme court would review the agency's decision for clear error (City of Belvidere, 181 Ill. 2d at 205, 692 N.E.2d at 302)--not de novo, as the supreme court previously had held.

- 4 -

Later, in Eden Retirement Center, Inc. v. Department of Revenue, 213 Ill. 2d 273, 284, 821 N.E.2d 240, 246 (2004), the supreme court seemed to revert to the former rule:  it prescribed a de novo standard of review when the facts were undisputed and the only issue was whether the property was exempt.  The supreme court stated: "[T]he Department's decision as to whether [the] plaintiff's property is exempt from taxation depends solely on the application of the appropriate legal standard to the undisputed facts, which is a question of law."  Accordingly, in a recent property-tax exemption case, we dutifully echoed the supreme court:  " '[T]he Department's decision as to whether [the] plaintiff's property is exempt from taxation depends solely on the application of the appropriate legal standard to the undisputed facts, which is a question of law.' "  Faith Builders Church, Inc. v. Department of Revenue, 378 Ill. App. 3d 1037, 1043, 882 N.E.2d 1256, 1261 (2008), appeal denied, 228 Ill. 2d 531, 889 N.E.2d 1115 (2008), quoting Eden Retirement Center, 213 Ill. 2d at 284, 821 N.E.2d at 246.

Soon after our decision in Faith Builders, the supreme court issued a decision in which it reaffirmed the three different standards of review in administrative-review cases:  manifest weight of the evidence for questions of fact, de novo for questions of law, and clear error for questions of fact and law mixed together.  Cinkus v. Village of Stickney Municipal Officers Electoral Board, 228 Ill. 2d 200, 210-11, 886 N.E.2d 1011, 1018 (2008).  In the third type of question--a question that was simultaneously legal and factual--" ' "the historical facts [were] admitted or established, the rule of law [was] undisputed, and the issue [was] whether the facts satisf[ied] the statutory standard, or[,] to put it another way, whether the rule of  law as applied to the established facts [was] or [was] not violated." ' "  Cinkus, 228 Ill. 2d at 211, 886 N.E.2d at

- 5 -

1018, quoting American Federation of State, County & Municipal Employees, Council 31 v. State Labor Relations Board, 216 Ill. 2d 569, 577, 839 N.E.2d 479, 485 (2005), quoting Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982). Manifest weight of the evidence would be an insufficient concept to bring to such a hybrid question, for evidence relates only to facts and the question is one of law as much as fact. Also, the legal aspect of the question calls for somewhat less deference than if the question were purely factual. Carpetland U.S.A., Inc. v. Illinois Department of Employment Security, 201 Ill. 2d 351, 369, 776 N.E.2d 166, 177 (2002). On a continuum of deference, clear error is located between manifest weight and de novo. Carpetland U.S.A., 201 Ill. 2d at 369, 776 N.E.2d at 177; see also Du Page County Board of Review v. Department of Revenue, 339 Ill. App. 3d 230, 234, 790 N.E.2d 918, 922 (2003) (remarking that, in practice, the difference between these degrees of deference can be subtle). "[A]n administrative agency's decision is deemed 'clearly erroneous' when the reviewing court is left with the ' "definite and firm conviction that a mistake has been committed." ' " Cinkus, 228 Ill. 2d at 211, 886 N.E.2d at 1018, quoting AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 395, 763 N.E.2d 272, 282 (2001), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

The supreme court acknowledged, in Cinkus, 228 Ill. 2d at 211, 886 N.E.2d at 1019, that the distinction between these three different standards of review "ha[d] not always been apparent in [its] case law"; and--significantly for our purposes--the supreme court cited Eden Retirement Center as an example of a case in which the distinction was not apparent (Cinkus, 228 Ill. 2d at 211, 886 N.E.2d at 1019). It follows

- 6 -

that <u>Eden Retirement Center</u>, on which Provena relies and on which we relied in <u>Faith Builders</u>, no longer is sound authority with respect to the standard of review in administrative-review cases in which the facts are undisputed and the law is to be applied to those facts. (Of course, since we upheld the Department's decision in <u>Faith Builders</u>, the same result would have followed in that case under the more deferential clear-error standard of review.)

The facts in the present case are undisputed, and the question before us is whether those facts entitle Covenant to an exemption under section 15-65(a) or 15-40(a)(1) (35 ILCS 200/15-65(a), 15-40(a)(1) (West 2002)). We conclude, from <u>Cinkus</u>, that we should review the Department's decision for clear error. See also <u>Calvary Baptist Church of Tilton</u>, 349 Ill. App. 3d at 330, 812 N.E.2d at 5; <u>Three Angels Broadcasting Network, Inc. v. Department of Revenue</u>, 381 Ill. App. 3d 679, 693, 885 N.E.2d 554, 567 (2008); <u>Illinois Beta House Fund Corp. v. Department of Revenue</u>, 382 Ill. App. 3d 426, 429, 887 N.E.2d 847, 849-50 (2008); <u>Du Page County Airport Authority v. Department of Revenue</u>, 358 Ill. App. 3d 476, 484, 831 N.E.2d 30, 38 (2005).

Of course, we can apply more than one standard of review in an appeal, depending on the issue under consideration. Insomuch as the parties disagree on the meaning of legislation or case law, we resolve the disagreement <u>de novo</u>. See <u>Cinkus</u>, 228 Ill. 2d at 210, 886 N.E.2d at 1018; <u>City of Belvidere</u>, 181 Ill. 2d at 205, 692 N.E.2d at 302. The cases make an exception for ambiguous statutes that the agency administers: we defer to the agency's interpretation of the ambiguous statute if the interpretation is reasonable. <u>Illinois Bell Telephone Co. v. Illinois Commerce Comm'n</u>, 362 Ill. App. 3d 652, 657, 840 N.E.2d 704, 709 (2005).

B. The Exemption for Charitable Purposes

1. Ownership By an Institution of Public Charity

Provena had the burden of proving, " 'clearly and conclusively,' " its entitlement to the claimed exemptions (Illini Media Co. v. Department of Revenue, 279 Ill. App. 3d 432, 435, 664 N.E.2d 706, 709 (1996), quoting Chicago Bar Ass'n v. Department of Revenue, 163 Ill. 2d 290, 300, 644 N.E.2d 1166, 1171 (1994)), and the Director has to resolve all debatable questions in favor of taxation without giving an " ' "unreasonably narrow" ' " construction to the statute (see Illini Media, 279 Ill. App. 3d at 435, 664 N.E.2d at 709, quoting People ex rel. Goodman v. University of Illinois Foundation, 388 Ill. 363, 370, 58 N.E.2d 33, 37 (1944), quoting People ex rel. Pearsall v. Catholic Bishop of Chicago, 311 Ill. 11, 16, 142 N.E. 520, 522 (1924)).  One of the reasons why the Director denied an exemption under section 15-65(a) (35 ILCS 200/15-65(a) (West 2002)) was Provena's failure to prove, clearly and conclusively, that it was a charitable institution.  Section 15-65(a) requires that the property in question--in this case, Covenant--be the "property of" an "institution of public charity."  35 ILCS 200/15-65(a) (West 2002).  The statute provides:

"All property of the following is exempt when actually

and exclusively used for charitable or beneficent purposes[]

and not leased or otherwise used with a view to profit:

(a) Institutions of public charity."  35

ILCS 200/15-65(a) (West 2002).

By contrast, section 6 of article IX of the Illinois Constitution, on its face, does not require ownership by a charitable organization; it merely requires that the

property be "used exclusively for *** charitable purposes."  Ill. Const. 1970, art. IX, §6.  It provides:

> "The General Assembly by law may exempt from taxation only the property of the [s]tate, units of local government and school districts[,] and property used exclusively for agricultural and horticultural societies[] and for school, religious, cemetery[,] and charitable purposes.  The General Assembly by law may grant homestead exemptions or rent credits."  Ill. Const. 1970, art. IX, §6.

While section 6 of article IX gives the General Assembly a choice whether to exempt the classes of property listed therein (saying the General Assembly "may" do so), it permits the General Assembly to exempt "only" those classes of property.  Ill. Const. 1970, art. IX, §6.  Thus, the General Assembly may not broaden or add to the exemptions that section 6 of article IX allows.  International College of Surgeons v. Brenza, 8 Ill. 2d 141, 145-46, 133 N.E.2d 269, 272 (1956).  Because the General Assembly, however, may decline to grant exemptions altogether, the General Assembly, by corollary, may restrict or limit any exemption over and above the restrictions or limitations in section 6 of article IX.  North Shore Post No. 21 of the American Legion v. Korzen, 38 Ill. 2d 231, 233, 230 N.E.2d 833, 835 (1967).  (North Shore Post No. 21 predates the 1970 Illinois Constitution.  Nevertheless, section 6 of article IX of the 1970 Illinois Constitution is merely a rephrasing of the corresponding provision, section 3 of article IX, of the 1870 Illinois Constitution (Ill. Const. 1870, art. IX, §3), and cases interpreting the provision in the 1870 constitution continue to be relevant.  Eden

Retirement Center, 213 Ill. 2d at 286, 821 N.E.2d at 247.)

Thus, in addition to the constitutional requirement that the property be used exclusively for charitable purposes, the General Assembly has set down a further requirement for the exemption:  the property must be owned by an "institution[] of public charity."  35 ILCS 200/15-65(a) (West 2002); Chicago Patrolmen's Ass'n v. Department of Revenue, 171 Ill. 2d 263, 270, 664 N.E.2d 52, 55-56 (1996); Most Worshipful Grand Lodge of Ancient Free & Accepted Masons of the State of Illinois v. Department of Revenue, 378 Ill. App. 3d 1069, 1075, 884 N.E.2d 1168, 1173 (2007). Under section 15-65(a), it will not suffice that the property is "exclusively used for charitable or beneficent purposes" ("beneficent" is synonymous with "charitable" (People ex rel. Nelson v. Rockford Lodge No. 64, Benevolent & Protective Order of Elks, 348 Ill. 528, 531, 181 N.E. 432, 433 (1932)); the owner of the property must be a charitable organization.  Chicago Patrolmen's Ass'n, 171 Ill. 2d at 270, 664 N.E.2d at 55-56).

In Methodist Old Peoples Home v. Korzen, 39 Ill. 2d 149, 157, 233 N.E.2d 537, 541-42 (1968), the supreme court listed six "distinctive characteristics of a charitable institution":  (1) the institution bestows benefits upon an indefinite number of persons for their general welfare, or the benefits in some way reduce the burdens on government; (2) the institution has no capital, capital stock, or shareholders and does not profit from the enterprise; (3) the funds of the institution are derived mainly from private and public charity and are held in trust for the purposes expressed in the charter; (4) charity is dispensed to all who need it and apply for it; (5) the institution puts no obstacles in the way of those seeking the charitable benefits; and (6) the primary

use of the property is for charitable purposes. See also <u>Eden Retirement Center</u>, 213 Ill. 2d at 287, 821 N.E.2d at 248 (deriving those six factors from <u>Methodist Old Peoples Home</u>); <u>Most Worshipful Grand Lodge</u>, 378 Ill. App. 3d at 1075, 884 N.E.2d at 1173 (same).

Courts also have applied the six factors to the issue of charitable <u>use</u>, <u>i.e.</u>, whether the property was "exclusively used for charitable or beneficent purposes" (35 ILCS 200/15-65(a) (West 2006)). <u>Eden Retirement Center</u>, 213 Ill. 2d at 287, 821 N.E.2d at 248; <u>Most Worshipful Grand Lodge</u>, 378 Ill. App. 3d at 1075, 884 N.E.2d at 1173; <u>Lutheran General Health Care System v. Department of Revenue</u>, 231 Ill. App. 3d 652, 657, 595 N.E.2d 1214, 1218 (1992). The factors lend themselves more readily to assessing the charitable nature of the owner--indeed, the supreme court originally described the factors as the "distinctive characteristics of a charitable institution" (<u>Methodist Old Peoples Home</u>, 39 Ill. 2d at 157, 233 N.E.2d at 541). Applying the six factors to the question of charitable use can be awkward if only because the sixth factor squarely poses the question of charitable use (<u>Eden Retirement Center</u>, 213 Ill. 2d at 287, 821 N.E.2d at 248 ("(6) *** exclusive, <u>i.e.</u>, primary, use of the property is for charitable purposes")), suggesting that the preceding five factors address some other question. Nevertheless, some of the factors do describe how property is used for charitable purposes, <u>i.e.</u>, bestowing benefits upon an indefinite number of persons, lessening the burdens on government, dispensing charity to all who need it and apply for it, and putting no obstacles in their way (<u>Methodist Old Peoples Home</u>, 39 Ill. 2d at 157, 233 N.E.2d at 541-42).

Part of the difficulty with the factors in Methodist Old Peoples Home (and, for that matter, with any set of factors) is discerning how important any one factor is compared to another. The First District has said that "[t]he factors outlined by the supreme court in [Methodist Old Peoples Home] are guidelines rather than definitive requirements." Arts Club of Chicago v. Department of Revenue, 334 Ill. App. 3d 235, 243, 777 N.E.2d 700, 707 (2002). That cannot be correct. Some of the factors are more than guidelines. The sixth factor is that the property be used exclusively for charitable purposes, and under the constitution and statute, exclusive use for charitable purposes is the sine qua non of the exemption (Ill. Const. 1970, art. IX, §6; 35 ILCS 200/15-65(a) (West 2006)). The supreme court has called the factors "guidelines or criteria." Eden Retirement Center, 213 Ill. 2d at 287, 821 N.E.2d at 248. Apparently, the only way of telling which factors are guidelines and which are essential criteria is to see how they are treated in case law. The factors are old--Methodist Old Peoples Home dates from 1968, and it relied on cases going back 75 years (Methodist Old Peoples Home, 39 Ill. 2d at 156-57, 233 N.E.2d at 541-42)--and it appears that one of the factors at issue, namely, charitable funding of the institution (Eden Retirement Center, 213 Ill. 2d at 287, 821 N.E.2d at 248), has waned in importance. But the other factors, or at least the ones at issue in this appeal, still seem to be in force.

If we credit the Department's argument, it would not matter that some of the factors had grown obsolete, for, according to the Department, Provena satisfies only one of the six factors: it has no capital, capital stock, or shareholders, and, as a corporation, it does not profit from the enterprise (see Methodist Old Peoples Home, 39 Ill. 2d at 157, 233 N.E.2d at 541). Clearly, not-for-profit status alone does not confer an

exemption under section 15-65(a).  Eden Retirement Center, 213 Ill. 2d at 290, 821 N.E.2d at 250; People ex rel. County Collector v. Hopedale Medical Foundation, 46 Ill. 2d 450, 464, 264 N.E.2d 4, 11 (1970).  We will consider the remaining five factors in turn.

### a. Benefits to an Indefinite Number of People for Their General Welfare So as To Reduce the Burdens on Government

The first factor from Methodist Old Peoples Home is that "the benefits derived are for an indefinite number of persons for their general welfare or [they] in some way reduc[e] the burdens on government."  Eden Retirement Center, 213 Ill. 2d at 287, 821 N.E.2d at 248.  This factor is more than a guideline; it describes what a charity essentially is.  "The fundamental ground upon which all exemptions in favor of charitable institutions are based is the benefit conferred upon the public by them and a consequent relief, to some extent, of the burden upon the State to care for[,] and advance the interests of[,] its citizens."  School of Domestic Arts & Science v. Carr, 322 Ill. 562, 569, 153 N.E. 669, 671 (1926); see also In re Estate of Graves, 242 Ill. 23, 28, 89 N.E. 672, 674 (1909) ("It would clearly be within the province of the park commissioners to erect drinking fountains or basins for horses" such as the one the testator provided for by charitable bequest).  To be for a charitable use or purpose, the gift must be a public, rather than a private, gift (14 C.J.S. Charities §10, at 182 (2006); Restatement (Second) of Trusts §§375, 376, (1959)); it must be "'general benevolence'" rather than " 'personal bounty to particular individuals' " (Saltonstall v. Sanders, 93 Mass. (11 Allen) 446, 466 (1865), quoting Attorney General v. Comber, 2 Sim. & Stu. 93 (1824)).  For

example, "[a] gift to poor relations or for their benefit is a private gift, although it would prevent their becoming a public charge." 14 C.J.S. Charities §13, at 185 (2006).

Obviously, Provena--basically, a conglomerate of hospitals--was not formed to bestow a private gift upon particular individuals, such as "poor relations." It is far from obvious, however, that Provena is a gift to the public. As we will discuss at greater length below, it is unclear to what extent Provena exercises "general benevolence" as opposed to doing what a for-profit hospital does: selling medical services. Provena argues it lessens the burdens of government because if not for the existence of Covenant, Champaign County would have to build a hospital. The supreme court has held, however, that "services extended *** for value received *** do not relieve the [s]tate of its burden." Willows v. Munson, 43 Ill. 2d 203, 208, 251 N.E.2d 249, 252 (1969). See also People ex rel. Nordlund v. Ass'n of the Winnebago Home for the Aged, 40 Ill. 2d 91, 101, 237 N.E.2d 533, 539 (1968); 14 C.J.S. Charities §3, at 177 (2006) ("Whatever is gratuitously done for the advancement of the public good is a public charity"); D. Hyman, The Conundrum of Charitability: Reassessing Tax Exemption for Hospitals, 16 Am. J.L. & Med. 327, 378 (1990) ("Reduced to its elements, one must simply be in the hospital 'business' and not distribute any profit in order to meet the liberal test [for exemption]. This is rather curious because *** for-profit hospitals are also in the hospital business. The inurement constraint alone is not sufficient reason to grant favorable tax treatment to one institution and not the other").

b. Funds Derived Mainly From Private and Public Charity

The third factor from Methodist Old Peoples Home (again, the second factor is not at issue) is that "funds are derived mainly from private and public charity[]

- 14 -

and the funds are held in trust for the objects and purposes expressed in the organization's charter." Eden Retirement Center, 213 Ill. 2d at 287, 821 N.E.2d at 248. The Director stated in his decision:

"[I]f we look at the financial picture of Covenant's parent, we see that for Provena Hospital's year end[ing] December 31, 2002, [the] 'Consolidated Statement of Operations Information' shows other revenue of $25,382,000, which is 3.4% of total revenue of $739,293,000. It is impossible to tell how much of the 3.4% of other revenue [was] derived from public and private charity because there is no further breakdown of this amount in the statement. [Citation to record.] As discussed previously, the record in this case is very limited in evidence concerning how Provena Hospitals, the owner of the property, qualifies as a charitable organization. If the entire 3.4% of 'other revenue' in Provena Hospital's statement was derived from public and private charity, I still would not be able to conclude that Provena Hospitals meets the [Methodist Old Peoples Home] guideline that it derives its funds mainly from public and private charity."

In American College of Surgeons v. Korzen, 36 Ill. 2d 340, 348, 224 N.E.2d 7, 11 (1967), overruled on other grounds by Christian Action Ministry v. Department of Local Government Affairs, 74 Ill. 2d 51, 57, 383 N.E.2d 958, 961 (1978), the

- 15 -

taxing authority argued that the college was not a charitable organization because approximately half of its funds came from members' dues.  The supreme court held:

> "A careful reading of the cases indicates that while the source of funds is listed as a characteristic of a charitable organization, each [case] concerns itself primarily with discovery of the facts relative to the use to which the funds are put.  ***  [W]here it is established that the funds and property are devoted to public purposes, the source of the funds is not the sole determinant factor."  American College, 36 Ill. 2d at 348, 224 N.E.2d at 11.

It appears that funding by charitable donations can help to establish the identity of an institution as charitable (Eden Retirement Center, 213 Ill. 2d at 287, 821 N.E.2d at 248; J. Colombo, Hospital Property Tax Exemption in Illinois: Exploring the Policy Gaps, 37 Loy. U. Chi. L.J. 493, 519 (2006)) but such funding is not essential (American College, 36 Ill. 2d at 348, 224 N.E.2d at 11).  "Recent data shows that, overall, nonprofit hospitals receive less than 2% of their revenues from private philanthropy."  37 Loy. U. Chi. L.J. at 520.  Making the absence of such funding dispositive would effectively end the charitable exemption for nonprofit hospitals.  37 Loy. U. Chi. L.J. at 520.  In Sisters of the Third Order of St. Francis v. Board of Review, 231 Ill. 317, 321, 83 N.E. 272, 273 (1907), the supreme court seemed to approve of a hospital's practice of subsidizing the medical care of the poor by charging patients who were able to pay.  But see M. Bloche, Health Policy Below the Waterline: Medical Care and the Charitable Exemption, 80 Minn. L. Rev. 299, 355 (1995) ("the imagery of charity rings hollow when it comes to hospitals.

Most obviously, the free care provided by nonprofit hospitals is financed largely by private payers, who are hardly inspired by donative benevolence"); 37 Loy. U. Chi. L.J. at 519 (theoretically, "donations are an excellent 'signal' that the public views a particular entity as undertaking charitable activities," and, therefore, "an excellent conceptual reason exists to use donations as a measure of an entity's 'charitable-ness' "). Thus, having an operating income derived almost entirely from contractual charges goes against a charitable identity (Small v. Pangle, 60 Ill. 2d 510, 517, 328 N.E.2d 285, 288-89 (1975)), but this factor, by itself, is not dispositive (American College, 36 Ill. 2d at 348, 224 N.E.2d at 11).

### c. Providing Charity to All Who Need It and Apply for It and Refraining from Interposing Any Obstacles to Such Charity

The fourth factor from Methodist Old Peoples Home is that "charity is dispensed to all who need [it] and apply for it," and the fifth factor, closely related to the preceding one, is that "no obstacles are placed in the way of those seeking the benefits." Eden Retirement Center, 213 Ill. 2d at 287, 821 N.E.2d at 248. The Director found as follows:

"*** I find that the record contains no information as to Provena Hospital's charitable expenditures in 2002. According to the ALJ in her Recommendation for Disposition, '[t]he testimony indicated, and the advertisements, collection practices, and other documents support the finding[,] that Covenant's policies and practices are the same as those of the owner of the property,' Provena Hospitals.

- 17 -

[Citation to ALJ's recommended decision.]  Without infor-

mation about Provena's expenditures for charitable care in

2002, it is not possible to conclude that the true owner of the

property is a charitable institution[,] as required by Illinois

law."

A charity dispenses charity and does not obstruct the path to its charitable

benefits.  Eden Retirement Center, 213 Ill. 2d at 287, 821 N.E.2d at 248.  Provena and

the amici curiae disagree with the Department on the meaning of " 'charity.' "  As one of

the amici curiae, the Illinois Hospital Association, observes, "charity" can have different

meanings depending on whether an article precedes it:  a charity is an organization,

whereas charity is what the organization dispenses.  Quoting Methodist Old Peoples

Home, 39 Ill. 2d at 156, 233 N.E.2d at 541, the Department argues that "charity is a gift"

and unless we know how much charity care Provena provides through its six hospitals,

we cannot make a valid generalization that Provena is a charitable institution.  The

Illinois Hospital Association argues the Department is distorting the meaning of

Methodist Old Peoples Home by omitting, from its quotation of that case, the indefinite

article that precedes "charity":  the supreme court said, in Methodist Old Peoples Home,

39 Ill. 2d at 156, 233 N.E.2d at 541, that "a charity is a gift" (emphasis added).  The

phrase comes ultimately from a Massachusetts case, which the supreme court first

quoted in Crerar v. Williams, 145 Ill. 625, 34 N.E. 467 (1893), as follows:

"A comprehensive legal definition of a charity, or

charitable use, is given by Gray, J., in Jackson v. Phillips, 14

Allen, 556 (approved by Perry in his work on Trusts, vol. 2,

- 18 -

sec. 697) as follows:  '<u>A</u> charity, in [the] legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their \*\*\* hearts under the influence of education or religion[;] by relieving their bodies from disease, suffering[,] or constraint[;] by assisting them to establish themselves [in] life[;] or by erecting or maintaining public buildings or works[] or otherwise lessening the burthens of government.  It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature.' "  (Emphases added.)  <u>Crerar</u>, 145 Ill. at 643, 34 N.E. at 470, quoting <u>Jackson v. Phillips</u>, 96 Mass. (14 Allen) 539, 556 (1867).

According to the Illinois Hospital Association, the phrase "a charity is a gift" has to do solely with how a charitable organization comes into existence--by some person or group of persons making a charitable gift to the community for the purpose of establishing a hospital--and does not require that the charity, after its inception, give anything away.  Provena argues it is a charitable organization because it provides medical care, which, according to <u>Crerar</u>, is a charitable purpose--" 'relieving \*\*\* bodies from disease, suffering[,] or constraint.' "  <u>Crerar</u>, 145 Ill. at 643, 34 N.E. at 470, quoting <u>Jackson</u>, 96 Mass. (14 Allen) at 556.

By the logic of Provena and the Illinois Hospital Association, the only giving that matters, for purposes of charity, is the gift by which the founders established

the hospital, whenever that occurred. A hospital thereafter could practice economic predation and nevertheless maintain its charitable status. It seems to us that confining the gift to the establishment of the hospital would make the gift dubious. If a patient, like virtually all the other patients, must agree to pay for his or her medical care, the patient receives a gift only in the rarefied form of an opportunity to purchase medical care locally. A new Wal-Mart would be a gift in a comparable sense--with the added bonus that it would pay property taxes. And if the medical bill includes a charge for the depreciation of assets, the gift becomes even more tenuous. Unlike Wal-Mart, a not-for-profit hospital would plow any profits back into the hospital, becoming bigger and better equipped. But, again, from the perspective of paying patients, the gift merely would be the enhanced opportunities to enter into increasingly expensive contractual relationships with the hospital and its physicians. In Crerar, 145 Ill. at 643-44, 34 N.E. at 470, a case Provena cites for the proposition that relieving bodies from suffering is, per se, charity, the testator made "a gift 'for the erection, creation, maintenance[,] and endowment of a free public library.' " (Emphasis added.)

If medical care, free or not, were charity in and of itself, the only difference between a charitable hospital and a for-profit hospital would be the "inurement constraint" (16 Am. J.L. & Med. at 378), and the supreme court made clear in Hopedale Medical Foundation, 46 Ill. 2d at 464, 264 N.E.2d at 11 (discussing federal and state exemptions based on inurement), that the inurement constraint implicit in the exemption from federal and state income taxation alone will not exempt a hospital from property taxation. One commentator asks rhetorically, "Would one ever allow a dry

cleaner or shoe store with an inurement prohibition to qualify for tax exemption?" 16 Am. J.L. & Med. at 378.

By holding medical care to be, in and of itself, charity, we effectively would excuse charitable hospitals from their ongoing mission of giving. We would hold that a hospital is being charitable, for instance, when it sends an impoverished patient a bill that the patient could never hope to pay. That holding not only would create a deafening cognitive dissonance, but it would ignore the supreme court's repeated rationale in cases involving charitable hospitals. If, as Provena claims, charity did not entail treating patients for free, a case the supreme court decided only a year after Sisters of the Third Order would make no sense. In German Hospital of Chicago v. Board of Review, 233 Ill. 246, 248-50, 84 N.E. 215, 216 (1908), the supreme court emphasized the number of patients the hospital treated for free or at reduced rates and, on that basis, held Sisters of the Third Order to be directly on point and the hospital to be a public charity exempt from taxation.

Provena interprets Sisters of the Third Order as meaning that the number of charity care patients does not matter. We do not read the case that way. In Sisters of the Third Order, 231 Ill. at 322, 83 N.E. at 273-74, the Board of Review of Peoria County argued that St. Francis Hospital was not an institution of public charity because of "the great disparity between the number of charity patients and those who pay for the care and attention they receive at this institution." If Provena were correct--if all a charitable hospital had to do was provide medical care because medical care was, ipso facto, charity--the supreme court surely would have answered the board of review's argument by saying it did not matter how many patients St. Francis Hospital treated for free

because all medical care, compensated or not, was charity. But that is not what the supreme court said. Rather, it said: "This objection seems to us without merit, so long as charity was dispensed to all those who needed it and who applied therefor ***." Sisters of the Third Order, 231 Ill. at 322, 83 N.E. at 274. Clearly, in this context, "charity" does not mean compensated medical care; it means uncompensated medical care. Further, the corollary seems to be that if St. Francis Hospital had failed to provide free treatment to those who needed it and applied for it, the board of review's objection would have had merit: the hospital would not have been an institution of public charity.

In Winnebago Home, the unsuccessful applicant for exemption was, like Provena, in the business of relieving bodies from disease, suffering, and constraint. "Upon accepting a resident, the association obligate[d] itself to provide him with a home, medical care, food, and, according to the testimony of one witness, a 'Christian burial.' " Winnebago Home, 40 Ill. 2d at 97-98, 237 N.E.2d at 537. If Provena were correct--if relieving bodies from disease, suffering, and constraint qualified as charity even though the relieving resulted in a bill for the persons getting relieved--the defendant in Winnebago Home would have received an exemption. But that is not what happened. The supreme court held:

> "[The] [d]efendant's insistence upon the payment of a
> sizable admission fee, the assignment by a resident of his
> assets[,] and the health requirements imposed[] constitute
> an even more serious impediment to the tax exempt status it
> seeks. We find that these provisions cannot be reconciled
> with our requirements of the application of benefits to an

- 22 -

> indefinite number of people, dispensing charity to all who need and apply for it[,] and not appearing to place obstacles of any character in the way of those who need and would avail themselves of the benefits defendant provides."
>
> Winnebago Home, 40 Ill. 2d at 101, 237 N.E.2d at 539.

Like Provena, the defendant in Winnebago Home, 40 Ill. 2d at 101-02, 237 N.E.2d at 539, compared itself to St. Francis Hospital in Sisters of the Third Order and Southern Illinois Hospital in People ex rel. Cannon v. Southern Illinois Hospital Corp., 404 Ill. 66, 88 N.E.2d 20 (1949). But the supreme court rejected the comparison precisely because "in the case of the hospitals[,] many impoverished persons were readily admitted and cared for without charge." (Emphasis added.) Winnebago Home, 40 Ill. 2d at 102, 237 N.E.2d at 539. These words do not leave us with the impression that the supreme court is indifferent about the number of impoverished persons an allegedly charitable organization serves free of charge. If, as Provena and the Illinois Association of Hospitals maintain, medical care is, per se, charity and the medical care does not have to be free because the only gift that matters is the gift establishing the hospital, the supreme court would not have distinguished Sisters of the Third Order and Cannon by observing that in those cases, "many" patients were "cared for without charge." See also Willows, 43 Ill. 2d at 208, 251 N.E.2d at 252 (contrasting "dispensing charity" with selling services). Also, the supreme court would not have minded that the defendant in Winnebago Home had "allocated from its sizable holdings only sufficient funds to provide for one needy applicant." Winnebago Home, 40 Ill. 2d at 102, 237 N.E.2d at 539-40.

We conclude that not only is a charity a gift (Quad Cities Open, Inc. v. City of Silvis, 208 Ill. 2d 498, 510-11, 804 N.E.2d 499, 507 (2004)) but that charity is a gift (People ex rel. Ryan v. World Church of the Creator, 198 Ill. 2d 115, 128, 760 N.E.2d 953, 961 (2001); Ould v. Washington Hospital for Foundlings, 95 U.S. 303, 311, 24 L. Ed. 450, 451 (1877)). "Charity" is an act of kindness or benevolence. Graves, 242 Ill. at 27, 89 N.E. at 673. There is nothing particularly kind or benevolent about selling somebody something. "Charity" is "generosity and helpfulness[,] esp[ecially] toward the needy or suffering" (Merriam-Webster's Collegiate Dictionary 192 (10th ed. 2000))--not merely helpfulness, note, but generosity. "Generosity" means "liber[ality] in giving." Merriam-Webster's Collegiate Dictionary 484 (10th ed. 2000). To be charitable, an institution must give liberally. Removing giving from charity would debase the meaning of charity, and we resist such an assault upon language. See C. Borek, Decoupling Tax Exemption for Charitable Organizations, 31 Wm. Mitchell L. Rev. 183, 187 (2004) ("the 'legal' meaning [of 'charitable'] has so stretched the term beyond its etymological boundaries as to render the concept vacant, unoccupied by any useful legal notion of what 'charitable' means"). The fourth and fifth factors in Methodist Old Peoples Home--dispensing charity to all who need it and apply for it and placing no obstacles in their way--are more than guidelines; they are essential criteria; they go to the heart of what it means to be a charitable institution.

As the Director observed, the record appears to contain no evidence of the amount of charity that Provena dispensed in 2002. Insomuch as the Director found this deficiency of proof to be fatal to Provena's status as a charitable institution, we are not left with a definite and firm conviction that he was mistaken.

- 24 -

## 2. "Exclusive" Use of the Property for Charitable Purposes

### a. The Impossibility of Making a Gift, and Thereby Performing Charity, Without Foregoing Compensation for the Thing Given

Provena admits that "charity is a 'gift.' " (Provena puts the word in quotation marks.) But Provena contends that "[the] 'gift' is not limited, as the Department claims, to free goods or services." (Emphasis in original.)

On the contrary, a gift is, by definition, free goods or services: "something voluntarily transferred by one person to another without compensation" (Merriam-Webster's Collegiate Dictionary 491 (10th ed. 2000)). Defining "gift" in any other way would do violence to the meaning of the word. One can make a gift by charging nothing at all. Or one can make a gift by undercharging a person, that is, charging less than one's cost (using cost as a baseline prevents the creation of an artificial gift through inflation of prices (37 Loy. U. Chi. L.J. at 511-12)), and in that case, part of the goods or services is given without compensation. See German Hospital, 233 Ill. at 248, 84 N.E. at 216 ("a large proportion of the entire number of patients received are treated either free or at less than actual cost").

Provena quotes People v. Young Men's Christian Ass'n of Chicago, 365 Ill. 118, 122, 6 N.E.2d 166, 169 (1936): "'Charity,' in law, is not confined *** to mere almsgiving." That is true. But it is confined to giving. Charity is a gift, and one can give a gift to a rich person as well as to a poor person, the object being "the improvement and promotion of the happiness of man." Congregational Sunday School & Publishing Society v. Board of Review, 290 Ill. 108, 113, 125 N.E. 7, 9-10 (1919). For example, out of kindness and benevolence, one could build a water fountain in a park, and rich and poor

alike could come and drink. But the designation of "charity" would be problematic if the water fountain were coin-operated. Regardless of whether the recipient of the goods or services is rich or poor or somewhere in between, it is nonsensical to say one has given a gift to that person, or that one has been charitable, by billing that person for the full cost of the goods or services--whether the goods or services be medical or otherwise. For a gift (and, therefore, charity) to occur, something of value must be given for free.

In the cases on which Provena relies--Young Men's Christian Ass'n; Quad Cities Open; Cannon; and Sisters of the Third Order--the institutions claiming a tax exemption charged fees as a means of financing charity care and other charitable gifts, or they charged fees no higher than the poor could afford. In Young Men's Christian Ass'n, 365 Ill. at 123-24, 6 N.E.2d at 170, the supreme court said:

> "The rates [the Young Men's Christian Association of Chi-
> cago] charged for its rooms are not based, alone, on the cost
> of the service rendered, but the object of the appellee is to
> furnish wholesome living conditions to young men at a price
> they can afford to pay and thereby correct the social evils
> that surround men who would otherwise be compelled to live
> in cheap rooming houses, amid sordid environments."

The record appears to contain no evidence that, in 2002, Covenant billed its patients only as much as they could afford to pay or that Covenant was, financially or otherwise, a kinder and gentler alternative to for-profit hospitals. See J. Colombo, The Role of Access in Charitable Tax Exemption, 82 Wash. U. L.Q. 343, 344 (2004) ("a number of empirical studies *** generally have found that *** private nonprofit, tax-exempt

hospitals do not operate much differently from for-profit counterparts in similar geographic areas. These studies confirm that the levels of 'uncompensated care' differ little between exempt and for-profit providers; that the range of services provided by both are similar; and that under current measures of quality assessment[,] there is little difference between the two").

In Quad Cities Open, 208 Ill. 2d at 501, 804 N.E.2d at 501, a not-for-profit corporation operated an annual golf tournament. The corporation sold admission tickets for the tournament, and the proceeds from the tickets, less overhead, went to charities such as American Red Cross and Special Olympics. Quad Cities Open, 208 Ill. 2d at 501, 804 N.E.2d at 501. "Charitable events often demand[ed] that a portion of the revenue be devoted to overhead costs in order to make the event possible." Quad Cities Open, 208 Ill. 2d at 516, 804 N.E.2d at 510. For example, to hold a tournament, prize money was needed for golfers, and funds were needed for cart paths, grandstands, concession stands, scoreboards, and water wells. Quad Cities Open, 208 Ill. 2d at 502-03, 804 N.E.2d at 502. Although only 7% of the corporation's revenue between 1998 and 2000 went to charity, it was plausible that the corporation had to incur 93% of overhead in order to generate the 7% of profit for charity. Quad Cities Open, 208 Ill. 2d at 515-16, 804 N.E.2d at 509-10. As the supreme court said, "[a] charity is not defined by percentages." Quad Cities Open, 208 Ill. 2d at 516, 804 N.E.2d at 509. But it does not follow that percentages are irrelevant. The disparity between overhead and charitable expenditures can be so extreme that it would be disingenuous to maintain that such a vast amount of overhead was incurred for the purpose of generating such a minuscule amount of charity. See Winnebago Home, 40 Ill. 2d at 102, 237 N.E.2d at 539-40. The

Director could be skeptical that Covenant's raison d'etre was the 0.7% of its revenue that it devoted to charity care.

The other two cases, Cannon and Sisters of the Third Order, at least involve hospitals, but they are distinguishable because all patients who were unable to pay received charity:  " 'charity was dispensed to all those who needed it' " (Cannon, 404 Ill. at 72, 88 N.E.2d at 23, quoting Sisters of the Third Order, 231 Ill. at 322, 83 N.E. at 274).  In Sisters of the Third Order, 231 Ill. at 320, 83 N.E. at 273, "[t]hose who [were] without money or property [were] cared for without charge," and "[t]hose who [were] able to pay [were] charged from $8 to $25 per week" so as to finance the care of the 5% of the patients who were unable to pay  (Sisters of the Third Order, 231 Ill. at 320, 83 N.E. at 273).  Because Provena's charity care program in 2002 considered only the patient's income relative to the federal poverty guidelines without considering the amount of the medical bill or the patient's other liabilities and Covenant devoted only 0.7% of its revenue to charity care, the Director could regard the program merely as a pretense of charity, a pro forma procedure that was not calculated to make a serious evaluation of need.  Although Provena proved that it turned no patient away, it did not prove that "[t]hose who [were] without money or property [were] cared for without charge" (Sisters of the Third Order, 231 Ill. at 320, 83 N.E. at 273)--or so the Director reasonably could have found.

### b. The Relevance of Percentages, Despite the Impossibility of an Across-the-Board "Quantitative Test"

In denying an exemption under section 15-65(a) (35 ILCS 200/15-65(a) (West 2002)), the Director stated as follows:

- 28 -

"The primary basis of my conclusion is simple: Covenant admitted that its 2002 revenues exceeded $113,000,000 and that its charitable activities cost it only $831,724, or about 0.7% of total revenue. The property tax exemption it requested was worth over $1,100,000. *** [T]o obtain the exemption, Covenant was required to prove that its primary purpose was charitable care. These financial figures fall short of meeting the primary purpose standard."

Provena argues as follows:

"[T]he Department's insistence on a quantitative test is simply indefensible. No [s]upreme [c]ourt decision adopts a quantitative approach. No quantitative element appears anywhere in the [Methodist Old Peoples Home] analysis. And the [s]upreme [c]ourt has never pinned entitlement to a charitable exemption on how much free care (or free anything) an organization provides. On the contrary, the [c]ourt has rejected such a quantitative test of charity at every opportunity. See, e.g., Sisters of the Third Order, 231 Ill. at 320, 322[,] [83 N.E.2d at 273-74] (rejecting the claim that 5% free patient care was too insubstantial to justify exemption); Quad Cities Open ***, 208 Ill. 2d [at] 515-516[,] [804 N.E.2d at 509] (same result for claim that 7% was insufficient to qualify as a charity)." (Emphasis in original.)

Section 6 of article IX does not speak of percentages; it speaks of "exclusive use" (Ill. Const. 1970, art. IX, §6), which courts have interpreted as "primary use," and the primary use of property is quintessentially a factual question. Whether property is exempt from taxation is highly dependent on the facts of each case. Lawrenceville v. Maxwell, 6 Ill. 2d 42, 48, 126 N.E.2d 671, 675 (1955). The Illinois Hospital Association says: "[T]he Department does not disclose the percentage that is required, only that Provena's is not enough." The point is valid, but the "percentage that is required" was not strictly necessary to the Director's decision, any more than it was necessary to the supreme court's decision when it criticized the defendant in Winnebago Home, 40 Ill. 2d at 102, 237 N.E.2d at 539-40, for allocating "only sufficient funds to provide for one needy applicant."

A scholar criticizes the uncertainty Illinois law causes by its failure to mandate a particular percentage of charity care. 37 Loy. U. Chi. L.J. at 514. But coming up with a fixed percentage, applicable to all charitable hospitals, would be problematic. As the supreme court long has held, a charitable institution may charge a fee to those who are able to pay. Winnebago Home, 40 Ill. 2d at 101, 237 N.E.2d at 539. For most hospitals, charging patients who are able to pay is, as a practical matter, a necessity. Given the permissibility and necessity of charging those who are able to pay, the amount of charity care a hospital provides may depend on how many impoverished people seek treatment. Sisters of the Third Order, 231 Ill. at 322, 83 N.E. at 274 ("The institution could not extend its benefactions to those who did not need them or to those who did not seek admission"). As the Illinois Hospital Association explains, how many impoverished people seek treatment in turn would depend on a number of highly variable

factors, to which an across-the-board, fixed percentage would be unsuitable, e.g., the type of hospital, local demographics, public health, the economy, the cost of medical care, and the cost and availability of medical insurance.

Thus, in Sisters of the Third Order, 231 Ill. at 322, 83 N.E. at 273-74, the "great disparity" between the patients who paid and the patients who were treated for free did not necessarily negate the primary purpose of charity. It was conceivable that only 11% of the patients who sought admission were unable to pay (5% of which the hospital treated for free and the other 6% of which the hospital treated at the county's expense (Sisters of the Third Order, 231 Ill. at 320, 83 N.E. at 273)).

The wide variability of need from one community to another did not prevent the supreme court from considering percentages or numbers in Sisters of the Third Order, 231 Ill. at 320, 83 N.E. at 273, and German Hospital, 233 Ill. at 248-49, 84 N.E. at 216. In the latter case especially, the supreme court discussed at great length "the facts found and certified in tabular form by the board of review as to the number of patients received each year during the past five years, the number treated free, [and] the number treated [at various discounted rates]," and the supreme court observed that "a large proportion of the entire number of patients received are treated either free or at less than actual cost." German Hospital, 233 Ill. at 248, 84 N.E. at 216.

Common sense suggests that the number of charity patients a hospital actually serves has direct relevance to one of the factors in Methodist Old Peoples Homes, 39 Ill. 2d at 157, 233 N.E.2d at 542, namely, whether the hospital "dispenses charity to all who need and apply for it." Charity is more than rhetoric. The term "charitable purpose" signifies "concrete, practical, objective charity, manifested by

things actually done for the relief of the unfortunate and the alleviation of suffering or in some work of practical philanthropy." In re Estate of Schureman, 8 Ill. 2d 125, 132-133, 133 N.E.2d 7, 11 (1956).

As the millions of Americans who cannot afford health insurance would attest, hospitals afford ample opportunities for "some work of practical philanthropy"-- and nothing is more practical than numbers. Medical care has become ruinously expensive. The cost of a hospital stay has been outpacing inflation for many years. "Between 1971 and 1981, the cost of a hospital day increased 15[%] annually." J. Lane, The Impact of the Medicare Prospective Payment System and Recommendations for Change, 7 Yale J. on Reg. 499, 501 (1990). "Estimated health care costs for 2005 exceed $1.9 trillion, a 48% increase over the $1.3 trillion spent in 2000. These costs are nearly 4.3 times higher than our national defense spending and have been rising at least 50% faster than the rate of inflation. Further, inpatient hospital costs have increased almost 50% in the last decade ***." Fifth Annual Health Law & Policy Colloquium: Provider Response to Cost Containment: An Insider Perspective, 15 Annals Health L. 387, 388 (2006). In 2001, 1,458,000 Americans filed for bankruptcy, and according to a recent study, "about half of these filings had a medical debt cause, meaning that about 729,000 bankruptcy filings were caused by medical debt." J. Colombo, Health Law Symposium: Federal & State Tax Exemption Policy, Medical Debt & Healthcare for the Poor, 51 St. Louis U. L.J. 433, 450 n.112 (2007). "[T]hese numbers do not include what is likely a much larger number of families that avoided bankruptcy despite similar financial problems." 51 St. Louis U. L.J. at 450. The number of uninsured Americans rose to 45 million in 2003, up 1.4 million from 2002 (D. Nelson, Antitrust Modernization Comm'n

- 32 -

Goes to Work, 17 Loy. Consumer L. Rev. 121, 132 (2004)), and, according to one of the amici, the American Hospital Association, the figure now is 47 million.

Against that backdrop of familiar facts, the Director found that in 2002, Covenant spent only 0.7% of its revenue on charity care. The Director could have drawn either of two inferences from that percentage. He could have inferred that in 2002, medical care in Champaign County was so affordable, and the citizenry so prosperous, that there simply was no occasion for Covenant to spend more than 0.7% of its revenues on charity care; a higher percentage would have required Covenant to "manufacture patients in need," as Provena puts it. Alternatively, the Director could have inferred that Covenant did not dispense charity to all who needed it and that Covenant, therefore, was not used "exclusively" for "charitable purposes." The Director chose the latter inference, and we are not left with a definite and firm conviction that he thereby made a mistake. If, in Winnebago Home, 40 Ill. 2d at 102, 237 N.E.2d at 540, the supreme court could draw an adverse inference from the trivial amount of resources the defendant had allocated for charity care, we do not see why the Director is precluded from drawing a comparable inference in the present case.

c. Covenant's Charity Care Policy

Applicant exhibit No. 29 is Covenant's "Charity Care Policy" that was in effect in 2002. The policy was approved on May 10, 1994. According to this policy, "[t]he provision of necessary services by St. Mary's Hospital shall not be withheld based upon an individual's ability to satisfy the related financial requirements." (Covenant used to be St. Mary's Hospital.) In the case of a patient who did not obtain an advance determination of his or her eligibility for charity care, Covenant would follow "normal

- 33 -

collection practices," and "[a]t any time during the collection process," the patient could apply for charity care by contacting the patient accounting office. Persons whose family income was above, but less than double, the poverty income guidelines set by the federal government and whose assets other than a principal residence were $5,000 or less were eligible for charity care. Those who qualified for charity care on the basis of their income and whose equity in a principal residence was $10,000 and whose other assets were $5,000 or less would be eligible for charity care after a determination of insurance benefits.

Specifically, those whose income was less than the guidelines would be eligible for a 100% reduction of the patient portion of the billed charges. Those whose income was greater than the guidelines but not more than 1 1/4 times the guidelines would be eligible for a 75% reduction. Those whose income was greater than the guidelines but not more than 1 1/2 times the guidelines would be eligible for a 50% reduction. Those whose income was greater than 1 1/2 times the guidelines but less than double the guidelines would be eligible for a 25% reduction.

The poverty income guidelines for 2000 were as follows:

| "Size of family unit | Poverty Guidelines |
|---|---|
| 1 | $ 8,350 |
| 2 | 11,250 |
| 3 | 14,150 |
| 4 | 17,050 |
| 5 | 19,950 |
| 6 | 22,850 |

|   |        |
|---|--------|
| 7 | 25,750 |
| 8 | 28,650 |

For family units with more than 8 members[,] add $2,900

for each additional member."

Those who qualified for charity care on the basis of income but who had assets above the aforementioned levels would become eligible for charity care to the extent that collections of charges for services rendered reduced assets below the $5,000 and $10,000 thresholds.

In his decision, the Director found that Covenant's charity care policy that was in effect in 2002 "fail[ed] to dispense charity according to the [Methodist Old Peoples Home] factors" because the policy "ignore[d] completely the financial burden incurred by the patients or families for the medical services rendered." The Director gave the following example:

"[A] patient whose portion of billed charges was $50,000[] and whose income was at a level allowing for a 50% waiver of charges would be left with a $25,000 bill after application of the sliding scale. It is unlikely that the patient or the patient's family[,] in this situation[,] would ever be able to pay off this bill, considering the level of income. A patient at the same level on the poverty income scale with billed charges of $1,000 would be left with an outstanding bill of only $500 after the sliding scale is applied. As the illustration demonstrates, application of Covenant's charitable policy would

- 35 -

result in an impoverished patient's family being faced with an unpaid bill 50 times higher than a patient at the same level of poverty income[,] simply because of the billed amount for the medical services rendered.  A true charitable care policy would be more meaningful and would result in a fair evaluation of a patient's ability to pay.

Put differently, it is clear that the patient whose billed medical charges are $50,000 is much more in need of a greater level of assistance from Covenant than the patient whose billed charges are $1,000.  Yet Covenant applies the same 50% reduction in charges to both patients, having the reduction only on the level of poverty income.

Moreover, during 2002, Provena Covenant referred patients with unpaid charges to collection agencies, even when a portion of the patient's charges had been reduced pursuant to the Charity Care Policy."

This critique of Covenant's charity care policy strikes us as reasonable.  In its disregard of liabilities, the charity care policy could have posed an obstacle to the dispensation of charity to the needy.  See Methodist Old Peoples Home, 39 Ill. 2d at 157, 233 N.E.2d at 542.  Basically, the charity care policy lacked nuance.  In simple terms of the dollar amount of assets, an elderly retired person might have the means of paying for a medical procedure, but he might have to liquidate his house and the investments upon which he depends for basic survival.  See B. Cohen, The Controversy Over Hospital

<u>Charges to the Uninsured--No Villains, No Heroes</u>, 51 Vill. L. Rev. 95, 102 (2006). Apparently, such a person would be ineligible for charity care at Covenant.

Although Covenant had a policy of admitting everyone regardless of their ability to pay, we will not assume that everyone availed themselves of that policy regardless of their ability to pay. The prospect of a crushing financial liability could well have been an obstacle in some people's minds; it could have deterred them from undergoing medical treatment.

In its brief, Provena argues it is undisputed that Covenant's charity care policy "is only a guide[] and is not mechanically applied" and that "a patient's eligibility for free care is always open to reassessment, even if a patient were originally determined to be financially able to pay." But the record does not seem to reveal how often Covenant departed from the guidelines of its charity care policy, how often a reassessment was done, what the reassessment considered, and how often a reassessment made any difference (not often, one might infer, if out of 110,000 admissions, Covenant gave free or discounted care to only 302 patients--and then hired a collection agency to contact 64 of those 302 charity care patients).

d. The Illusory Nature of Much of Covenant's "Charity Care Costs"

The dollar amount of charity care can be measured in either of two ways: (1) the cost to the hospital or (2) the amount the hospital charged. 37 Loy. U. Chi. L.J. at 511. If cost is used, it can be either average cost, which includes overhead, or it can be marginal cost. 37 Loy. U. Chi. L.J. at 511. Section 20(3) of the Community Benefits Act requires hospitals to report their charity care as measured by average cost: the "actual cost of services provided, based on the total cost[-]to[-]charge ratio derived from the

hospital's Medicare cost report." 210 ILCS 76/20(3) (West 2006). Marginal cost is the excess cost of treating an additional patient. See 37 Loy. U. Chi. L.J. at 511 n.111. For example, if treating 10 patients costs the hospital $10,000 but treating 11 patients costs the hospital $10,500, the marginal cost of treating the eleventh patient is $500. The average cost of treating all 11 patients is $10,500 divided by 11, or about $954. See 37 Loy. U. Chi. L.J. at 511 n.111. Measuring charity care by charges yields a higher dollar figure than measuring by cost; and measuring by average cost yields a higher dollar figure than measuring by marginal cost. 37 Loy. U. Chi. L.J. at 511.

A scholar lays out the case for average costs as follows:

"[A]s a matter of theory, using charges to measure charity care is patently ridiculous. In this regard, hospitals operate akin to hotels, which have a 'rack rate' for their rooms. Like the rack rate on hotel rooms, virtually no one actually pays the hospital's 'rack rate' for services; instead, hospitals negotiate discounted reimbursement rates with insurance companies, or such rates are set by the government as part of the Medicare and Medicaid program. Using charges as the measure of charity care, therefore, would simply let hospitals inflate their charity care 'numbers' by setting higher prices for services that they know will never be collected, or if collected at all, are charged only to uninsured patients. ***

As between average and marginal cost measures, a

- 38 -

good case can be made for either. The argument for marginal costs is that in the short run, filling empty beds with charity patients or taking a few extra x-rays with a machine already paid for costs very little[] and hospitals should not be 'credited[,]' in the charity care ledger[,] with part of their overhead and capital investment in providing these services, since those investments would have to be made anyway for paying patients. Over time, however, nonpaying patients represent a more or less permanent burden on a hospital and will eventually require replacement of assets sooner than would have been the case if the charity patients had not been served. Thus, average costs (e.g., including overhead and depreciation in the cost number) represent a better 'true' measure of charity care in the long run. Average costs, in fact, are the measure that most academics use in measuring the value of charity care. Also, average costs are the measure used by a number of states in legislation relating to charity care reporting, including the recently enacted Community Benefits Act in Illinois [(210 ILCS 76/1 through 99 (West 2006))] (although states have also used the marginal cost measure in some circumstances)." 37 Loy. U. Chi. L.J. at 511-13.

We find this reasoning to be persuasive. In addition, we note that in German Hospital,

233 Ill. at 248, 84 N.E. at 216, the supreme court seemed to quantify charity care by its cost ("a large proportion of the entire number of patients received are treated either free or at less than actual cost"). And, again, in section 20(3) of the Community Benefits Act (210 ILCS 76/20(3) (West 2006)), the legislature designated average cost as the measure of charity care.

In 2002, pursuant to its charity care policy, Covenant treated some patients for free and discounted its bills for other patients. Apparently, in calculating the amount of its charity care, Covenant used the average cost of the discounted portions of the bills. The Director stated:

"The applicant has asserted in several different contexts that the cost of waiving charges pursuant to its charity care policy in 2002 was $831,724 [citations to record] while the revenue it waived amounted to $1,758,940 [citations to record]. To obtain the cost figure, the [a]pplicant took the total cost of providing care in the hospital and the total billed amounts and developed a cost[-]to[-]charge ratio. The ratio was applied to the charges generated. [Citations to record.] $1,758,940 divided by $831,724 equals 2.1148."

As the Director explained, in the case of a patient whose bill Covenant discounted by 50%, the markup inherent in the remaining 50% more than consumed the charity care in the 50% discount, if charity care were measured by average cost. The Director reasoned as follows:

" [A] patient entitled to a 50% waiver based upon her

level on the poverty income scale[] and who received a $50,000 bill would be left with a $25,000 balance after application of the sliding scale reduction. This $25,000 outstanding bill, if paid by the patient, actually would have generated an average mark[]up of $1,358 for Covenant. ($50,000 divided by 2.1148 equals $23,642. The difference of $1[,]358, based upon Covenant's formula, apparently would have been the margin above its costs for the preferred service.) It is impossible to conclude that this policy truly is charity as contemplated by the [Methodist Old Peoples Homes] guidelines. Thus, *** the Department's counsel would appear to be correct in characterizing this practice as 'the illusion of charity.'"

Thus, it would appear that in the case of the patients whose bills Covenant discounted by 50% or 25%, Covenant actually came out ahead (at least, in terms of what the patients owed) and, therefore, extended no charity at all to those patients. The figure of $831,724, small as it is relative to Covenant's total revenues, appears to be an exaggeration.

### e. Shortfalls in Medicare and Medicaid

Applicant exhibit No. 64 is entitled "Provena Covenant Medical Center Charitable Contributions [in] 2002," and it lists the following two items, among others:

"<u>Cost</u>

2. Medicaid Subsidy @ Cost          $3,105,217

3. Medicare Subsidy @ Cost $7,418,217."

The First, Second, and Third Districts have held that writing off "bad debt" is not charity. Alivio Medical Center v. Department of Revenue, 299 Ill. App. 3d 647, 652, 702 N.E.2d 189, 193 (1998); Highland Park Hospital v. Department of Revenue, 155 Ill. App. 3d 272, 280, 507 N.E.2d 1331, 1336 (1987); Riverside Medical Center v. Department of Revenue, 342 Ill. App. 3d 603, 609, 795 N.E.2d 361, 366 (2003). One commentator disagrees with these decisions. 37 Loy. U. Chi. L.J. at 513. He maintains that Medicaid reimbursements (and, presumably, also Medicare reimbursements) that "fail to fully cover average costs" "probably should count as charity care because this represents a net cash outflow." 37 Loy. U. Chi. L.J. at 512. He reasons as follows:

"One can certainly sympathize with the view that from the standpoint of the patient, being accepted for treatment with an up-front guarantee that the hospital will not seek pay-ment is better than being billed for treatment and hounded by collection efforts, even if the ultimate result (no payment) is the same. But from the standpoint of the hospital, both scenarios result in a lack of payment that the hospital must make up for elsewhere to stay financially viable, and there is little doubt that a significant portion of bad debt is in fact related to the patient's financial inability to pay ***. *** At some point, if government keeps piling on uncompensated care obligations without some kind of offsetting revenue enhancement, the hospital will simply no longer be able to

- 42 -

operate. Thus, an absolute rule that bad debts do not 'count' as part of the justification for exemption also seems wrong despite the courts' conclusions." 37 Loy. U. Chi. L.J. at 513.

Initially, we note that "treatment of Medicare and Medicaid patients [is] a virtual requirement" for exemption from the federal income tax (37 Loy. U. Chi. L.J. at 498, citing IHC Health Plans, Inc. v. Commissioner of Internal Revenue, 325 F.3d 1188, 1197-98 (10th Cir. 2003)), as the American Hospital Association candidly admits. Further, from a legal point of view, we disagree with the reasoning that just because the end result of bad debt and charity is the same (lack of payment to the hospital), bad debt should be considered charity. If an organization could acquire a tax exemption for giving up on collecting from deadbeat customers, nearly every business in Illinois would be tax-exempt.

As we have explained, charity from one person to another is a gift. Perhaps it is possible to give someone a gift in the form of forgiveness of debt, but to accomplish that gift, one surely would have to do more than write off the debt. Writing off a patient's bad debt involves only the hospital and its databases. Vis-a-vis the hospital and the patient, the relationship of creditor and debtor remains intact--and, presumably, the patient will conduct his affairs accordingly; he might forego opportunities, and, generally, he will live under a cloud, assuming that everything he owns and acquires could eventually be subject to execution. See 51 Vill. L. Rev. at 102. In fact, the ALJ found that "[i]f a patient [paid] an amount on an account that was included in [Covenant's] bad debt expense, then the payment [was] recorded as a recovery to bad debt." And so nothing really has changed between the patient and the hospital. The

hospital merely has decided, for its own accounting purposes, that trying to enforce the debt would be futile or economically unrewarding--hardly a decision that exudes the "warmth and spontaneity indicative of [a] charitable impulse" (Willows, 43 Ill. 2d at 208, 251 N.E.2d at 252).

Because a gift is, as we have explained, an uncompensated transfer, the hospital cannot be someone's creditor with respect to a certain sum and simultaneously be the person's charitable benefactor with respect to that same sum. A decision about the futility of collection that a creditor makes in the privacy of his office does not vitiate the contractual relationship between the creditor and debtor. Like any other gift, a gift in the form of forgiveness of debt requires some kind of delivery. Berry v. Berry, 238 Ill. App. 507, 510 (1925); Restatement (Second) of Contracts §§274, 277(1), at 366, 370 (1981); 38 Am. Jur. 2d Gifts §45 (2008). Further, the supreme court has held: "[W]here there is no proof of consideration for the forgiveness of a debt, an attempt to forgive a debt is ineffective either as a gift or as an executory contract." Ermold v. Bear, 358 Ill. 233, 238, 193 N.E. 184, 186 (1934); see also Restatement (Second) of Contracts §273, at 364 (1981). It appears that once a hospital enters into a contract with a patient whereby the patient agrees to pay for services, transforming that patient into a charitable beneficiary is somewhat more complicated, legally, than simply making a notation in the hospital's accounts. Provena has not explained how, from a legal point of view, this transformation would have come about. See A. Noble & A. Hyams, Charitable Hospital Accountability: A Review and Analysis of Legal and Policy Initiatives, 26 J.L. Med. & Ethics 116, 119 n.66 (1998) ("American Association of Certified Public Accountants issued updated health care audit guidelines in 1990," under which "hospitals must now

- 44 -

segregate bad debt from charity care on their financial statements. Bad debt is now reported as an expense. Charity care, considered services provided without expectation of payment, is reported as a footnote on the financial statement").

We understand that probably half the time, the reason for default is that the patient simply cannot pay. 37 Loy. U. Chi. L.J. at 513 ("Some academic studies have shown that roughly 50% of hospital bad debt is likely due to inability to pay, rather than simply debt avoidance or poor management"). According to the ALJ's findings, approximately 60% of Covenant's inpatient admissions originate through the emergency room--probably not an ideal place for a careful and methodical assessment of someone's financial situation. We can envision an argument that referral to a collection agency is part of the procedure of charity care. Through the services of the collection agency, Covenant assesses the extent of the patient's financial need, and once the collection agency validates the patient as an impoverished person, Covenant writes off the debt, and the write-off is charity. Setting aside the obstacle posed by Ermold, the main problem with this argument is that Covenant continued to accept payments on what Covenant had designated, purely in its accounts, as bad debt.

We do not mean to put Covenant in a bad light simply because it uses collection agencies. There is nothing wrong, per se, with a charitable organization using collection agencies and even lawsuits to collect what is owed to it. As we have discussed, charitable organizations may enter into contracts with those who are able to pay. It would be illogical to say, on the one hand, that a charitable organization may enter into a contract and, on the other hand, to forbid the charitable organization from insisting on the performance of the contract. The resources of a charitable organization are finite,

- 45 -

and those who fail to pay, even though they could pay without suffering economic hardship, effectively use resources that otherwise might have gone to the poor. In our mind, the only relevance of Covenant's sending accounts to collection agencies is the negation of a charitable relationship with respect to the balances in those accounts. In 2002, Covenant sent 10,085 accounts to collection agencies but gave charity care to only 302 patients. Not all those 10,085 accounts, or maybe not even most of them, originated from 2002, but the vast disparity between those numbers could strike a reasonable trier of fact as significant. As Provena says in its brief, there could be a variety of reasons for patients' failure to pay. One of the foremost reasons, however, surely would be an inability to pay. The Director could reasonably infer that a lot of patients were not receiving charity care who needed it.

### f. The Significance of the Stipulations

Provena argues that because the Department stipulated that Covenant "dispenses health care to all who apply for it," "regardless of their ability or inability to pay for the service," it is established, as a matter of law, that Covenant provides charity to all who are in need. See In re Marriage of Sanborn, 78 Ill. App. 3d 146, 149, 396 N.E.2d 1192, 1195 (1979) ("[p]arties are bound by their stipulations"). This is a non sequitur. Just because Covenant never turns a patient away because of the patient's inability to pay, it does not follow that Covenant thereby provides charity. If, despite the patient's inability to pay, the patient is contractually liable to reimburse Covenant for the medical treatment, Covenant has extended no charity to that patient.

### g. Off-Site Charity

In applicant exhibit No. 64, entitled "Provena Covenant Medical Center

- 46 -

Charitable Contributions [in] 2002," Provena alleges that Covenant made the following charitable contributions (other than charity care and the Medicaid and Medicare subsidies, which we have already discussed):

|  | "Cost |
|---|---|
| 4. Crisis Nursery Services & Support | $ 25,851 |
| 5. Volunteer (community benefit) classes/ services | $189,509 |
| 6. Emergency Medical Services (training & support to community and area agencies) | $173,228 |
| 7. Charitable subsidy on ambulance service | $888,091 |
| 8. Donations to Other Not-for-Profits (less value of participation) | $ 54,370 |
| 9. Behavioral Health community benefit | $374,537 |
| 10 Subsidy for graduate medical education | $531,688." |

It is unclear to us that these items, admirable as they are, describe uses of the subject property as opposed to uses of income from the subject property or uses of other property. "The use to which the property is devoted is decisive rather than the use to which income derived from the property is employed." City of Lawrenceville, 6 Ill. 2d at 49, 126 N.E.2d at 676. "[P]roperty which is used to produce income to be used exclusively for charitable purposes may not be exempted from taxation, the test being, instead, the present use of the property rather than the ultimate use of the proceeds derived from the property sought to be exempted." Goodman, 388 Ill. at 374, 58 N.E.2d at 39. "Whether or not [a hospital] is a charity is to be determined by the treatment which the patients receive at the hands of those in charge of the hospital." Sisters of the

<u>Third Order</u>, 231 Ill. at 323, 83 N.E. at 274.  See also <u>Midwest Physician Group, Ltd. v. Department of Revenue</u>, 304 Ill. App. 3d 939, 957, 711 N.E.2d 381, 393 (1999) (exemption depends on activities "on the property"); <u>Congregational Sunday School</u>, 290 Ill. at 118, 125 N.E. at 11 ("It is not the use to be made of the profits but the nature of the business done that is to be considered in deciding the question of liability to taxation").  In this respect, the Illinois standard for exemption from property taxes is different from the more diffuse "community benefit" standard for exemption from the federal income tax.  See Rev. Rul. 69-545, 1969-2 C.B. 117-18; 37 Loy. U. Chi. L.J. at 497-98.

The ambulance service (item No. 7), for example, undoubtedly benefits the community, and, therefore, we assume it counts for purposes of the federal income-tax exemption.  But Illinois law scrutinizes the use of the subject property, and we do not know where the ambulances are garaged.  Do they depart from Covenant and bring patients back, or are they dispatched from a separate address?  The Department suggests, with citations to the record, that the majority of people transported by the ambulances appear to be covered by third-party payers such as Blue Cross, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), and health maintenance organizations.  Provena does not disagree.  It is unclear to what extent the $888,091 for this item consists of the "shortfall" resulting from the discounted rates that insurers paid.  Such discounts would not be charitable.  See <u>Riverside Medical Center</u>, 342 Ill. App. 3d at 610, 795 N.E.2d at 367.

C. The Exemption for Religious Purposes

1. <u>The</u> <u>Constitutional</u> <u>and</u> <u>Statutory</u> <u>Provisions</u>

Section 6 of article IX of the Illinois Constitution of 1970 allows the

General Assembly to exempt "property used exclusively for religious *** purposes." Ill.

Const. 1970, art. IX, §6. Section 15-40 of the Property Tax Code provides as follows:

"(a) Property used exclusively for:

(1) religious purposes ***

* * *

qualifies for exemption as long as it is not used with a view to

profit." 35 ILCS 200/15-40(a)(1) (West 2002).

## 2. Forfeiture

In the application for exemption that it filed in December 2002, Provena

never claimed an exemption for religious purposes (35 ILCS 200/15-40(a)(1) (West

2002)); it claimed an exemption only for charitable purposes (35 ILCS 200/15-65(a)

(West 2002)). Because the county board of review never had an opportunity to consider

whether Covenant qualified for an exemption for religious purposes, the Department

argues that Provena failed to exhaust its administrative remedies and is barred from

invoking section 15-40(a)(1) on appeal. See In re Application of County Collector of Du

Page County, 157 Ill. App. 3d 355, 361, 510 N.E.2d 1240, 1244 (1987). Provena responds

that the Department has forfeited the defense of failure to exhaust administrative

remedies, because the Department failed to raise that defense in circuit court. See In re

Application of Aurand, 90 Ill. App. 3d 560, 565, 413 N.E.2d 161, 165 (1980). We agree

with Provena. We further note that in his decision, the Director addressed the substan-

tive merits of Provena's claim of an exemption for religious purposes.

## 3. The Effect of the Stipulations

In the administrative proceedings, the Department stipulated that

- 49 -

"Covenant's stated and ongoing mission is to serve as the Catholic health[-]care ministry and charitable hospital in the Champaign/Urbana area and to build communities of healing and hope by compassionately responding to human need in the spirit of Jesus Christ" and that Covenant was "founded, organized, owned[,] and operated as an apostolic mission and health[-]care ministry of the Catholic Church."

According to Provena, these stipulations compel a determination that Covenant is exempt under section 15-40(a)(1) (35 ILCS 200/15-40(a)(1) (West 2002)). We disagree. It is Covenant's actual practice, not merely its mission, which determines the right to exemption. See Methodist Old Peoples Home, 39 Ill. 2d at 157, 233 N.E.2d at 542. The issue is not whether Covenant is operated as an "apostolic mission and health care ministry of the Catholic Church" but whether it is "used exclusively for *** religious purposes" as case law defines that phrase. See 35 ILCS 200/15-40(a)(1) (West 2002). The stipulations do not squarely address that issue.

If "religious purpose" meant whatever one did in the name of religion, it would be an unlimited and amorphous concept. Exemption would be the rule, and taxation the exception. "In a sense, everything a deeply devout person does has a religious purpose." Faith Builders, 378 Ill. App. 3d at 1046, 882 N.E.2d at 1264. In Fairview Haven v. Department of Revenue, 153 Ill. App. 3d 763, 768-69, 506 N.E.2d 341, 345 (1987), we were unpersuaded by the reasoning that a nursing home had a religious purpose because taking care of the elderly was a way of "tying preaching to action." "Religious purpose" within the meaning of section 15-40(a)(1) (35 ILCS 200/15-40(a)(1) (West 2002)) has to be narrower than "Christian service," or else "religious purpose" would mean everything (and, therefore, nothing). In People ex rel.

McCullough v. Deutsche Gemeinde, 249 Ill. 132, 136-37, 94 N.E. 162, 164 (1911), the supreme court stated: "[A] religious purpose means a use of such property by a religious society or body of persons as a stated place for public worship, Sunday schools[,] and religious instruction." In People ex rel. Carson v. Muldoon, 306 Ill. 234, 238, 137 N.E. 863, 864 (1922), overruled in part on other grounds by McKenzie v. Johnson, 98 Ill. 2d 87, 100, 456 N.E.2d 73, 79 (1983), the supreme court said, with reference to the quoted passage from Deutsche Gemeinde: "This was not stated as inclusive of everything that might in the future be regarded as a use for religious purposes but as illustrative of the nature of such use." If, as Muldoon said, public worship, Sunday schools, and religious instruction are "illustrative of the nature of [religious] use," it must follow that "religious use" has a determinable nature and that to be a religious use, the activity must somehow resemble the activities listed in Deutsche Gemeinde. We do not see how medical care resembles public worship, Sunday schools, or religious instruction. Cf. Calvary Baptist, 349 Ill. App. 3d at 327, 812 N.E.2d at 2 (throughout the year, the property was used for Bible study classes, teen ministry events and meetings, and devotional activities, with occasional and incidental secular events).

### 4. Primacy of the Use

Provena had to prove that the religious use of the property was primary and that any secular use was incidental. See Fairview Haven, 153 Ill. App. 3d at 774, 506 N.E.2d at 349. If the operation of the property is businesslike and more characteristic of a place of commerce than a facility used primarily for religious purposes, the property is not exempt from taxation under section 15-40(a)(1) (35 ILCS 200/15-40(a)(1) (West 2002)). Faith Builders, 378 Ill. App. 3d at 1046, 882 N.E.2d at 1264. In 2002, more

than 99.99% of Covenant's patients entered into contracts to pay for their medical treatment.  Almost all of Covenant's $115 million in revenue came from insurance companies, persons paying for their own treatment, and other contractual sources. Donations totaled only $6,938.  See Cook Communications Ministries v. Department of Revenue, 345 Ill. App. 3d 753, 762, 803 N.E.2d 524, 530 (2004).  Covenant sent 10,085 accounts to collection agencies in 2002.  The record does not appear to reveal how often theological instruction was given during the 110,000 admissions that year, but Covenant spent $813,694 on advertising.  Covenant more resembles a business with religious overtones than property used primarily for religious purposes.  See Cook Communications Ministries, 345 Ill. App. 3d at 758, 803 N.E.2d at 527; Fairview Haven, 153 Ill. App. 3d at 775, 506 N.E.2d at 349; Faith Builders, 378 Ill. App. 3d at 1046, 882 N.E.2d 1264.

## D. Considerations of Public Policy

The amici warn that adverse social consequences will follow if we reverse the circuit court's judgment and affirm the Director's decision.  They say that with the number of uninsured Americans increasing and governmental programs failing to keep up with the rising cost of health care, not-for-profit hospitals already operate on thin margins.  The loss of the tax exemption would make these hospitals less attractive to lenders and would create a perverse economic incentive for the hospitals to shift resources away from community needs other than free or discounted medical care. Because not-for-profit hospitals have no funds to spare, they would have no choice but to pass on to patients and commercial insurers the added cost of property taxes, and to the extent they were unable to do so, they would have to cut services or even close their

- 52 -

doors, swelling the ranks of the uninsured and burdening the state with the indigent patients whom the hospitals formerly served, to the detriment of their bottom line.

These are arguments of public policy, and it is the legislature's job, not ours, to make public policy. Board of Education of Dolton School District 149 v. Miller, 349 Ill. App. 3d 806, 811, 812 N.E.2d 688, 693 (2004). Instead, we strive to be faithful to the meaning of legislation and case law; and if these authorities, correctly interpreted, do not readily apply to the modern polycorporate hospital, so be it. Just because the test for exemption is, in some respects, "anachronistic, a reflection of a time without third[-]party pay[e]rs and sophisticated medical care[,] *** it does not necessarily follow that the changed circumstances still merit a tax exemption. Instead, perhaps the exemption is as anachronistic as the reasons that originally gave rise to it. Things that were once tax-exempt can become taxable if circumstances change." 16 Am. J.L. & Med. at 379.

In several jurisdictions, the decisions of which the American Hospital Association cites, the concept of "charity" has become so amorphous and so tractable as to be virtually devoid of meaning. "A word that comes to mean everything in effect means nothing[ at all]." 31 Wm. Mitchell L. Rev. at 211. The term "charity" has become magical gibberish to sanctify any socially beneficial use of property that a court deems worthy of subsidy. But our constitution already enumerates the uses of property that are categorically worthy of exemption--e.g., schools, cemeteries, agricultural and horticultural societies--and hospitals are not among them. Ill. Const. 1970, art. IX, §6. If, under section 6 of article IX, property used for "charitable purposes" is simply property that is put to some publicly beneficial purpose, why would it be necessary to

separately list schools, for instance, and agricultural societies, which obviously use property in a publicly beneficial way by defeating ignorance and hunger? The way the constitutional provision is phrased, it does not list schools and agricultural societies as examples of charitable purposes ( by saying "and other charitable purposes" or words to that effect).

As one commentator explains, the slippage of the meaning of "charity" began long ago, when the Statute of Charitable Uses (43 Eliz. 4 (1601)), codifying developments in the English common law, expanded the meaning of "charity" beyond its "commonly understood definition of economic relief for the poor," "to encompass virtually anything deemed to be in the public interest." 31 Wm. Mitchell L. Rev. at 191-93. Because the Statute of Charitable Uses became part of Illinois common law (Continental Illinois National Bank & Trust Co. v. Harris, 359 Ill. 86, 90, 194 N.E. 250, 252 (1934); 5 ILCS 50/1 (West 2006)), the supreme court has held that " '[c]harity,' in the legal sense, is not confined to mere alms[]giving or the relief of poverty and distress but has a wider signification, which embraces the improvement and promotion of the happiness of man" (Harris, 359 Ill. at 92, 194 N.E. at 253). But it is impossible to miss the recurrent theme of charity care in the supreme court's decisions on the exemption of hospitals from taxation. It is as if the supreme court decided, early on, to resist any further dilution of the meaning of "charity," by holding that improving and promoting the happiness of man entailed dispensing charity care as needed. See Sisters of the Third Order, 231 Ill. at 322, 83 N.E. at 274 ("so long as charity was dispensed to all those who needed it and who applied therefor").

The language we use in the State of Illinois to determine whether real property is used for a charitable purpose has its genesis in our 1870 constitution. It is obvious that such language may be difficult to apply to the modern face of our nation's healthcare delivery systems. Even the seminal case in Illinois, <u>Methodist Old Peoples Home v. Korzen</u>, was decided when Medicare was in its infancy and Medicaid did not yet exist. The capital needs of a properly equipped modern hospital were not even imaginable in 1965. It is of obvious public benefit for any community to have available one or more modern hospitals, but until such time as the legislature sees fit to either change or make definite the formula for the determination of the medical/charitable use of real property, Provena cannot, on the record before us here, prevail in its attempt to exempt itself from real estate taxation.

III. CONCLUSION

For the foregoing reasons, we reverse the circuit court's judgment.

Reversed.

McCULLOUGH and KNECHT, JJ., concur.